606 A.2d 295

Estella BLACK, et al.

v.

LEATHERWOOD MOTOR COACH CORPORATION.

No. 1320, Sept. Term, 1991.

Court of Special Appeals of Maryland.

May 8, 1992.

Certiorari Denied Sept. 15, 1992.

Toni S. Lifshotz, argued (Henry I. Greenberg, on the brief), Baltimore, for appellants.

Jeffrey R. DeCaro, argued (Deborah E. Kane and O'Malley & Miles, on the brief), Upper Marlboro, for appellee.

Argued before ROSALYN B. BELL, FISCHER and DAVIS, JJ.

ROSALYN B. BELL, Judge.

Appellants/cross-appellees Estella Black and Mary Martinez brought an action against appellee Leatherwood Motor Coach Corporation (Leatherwood) and others for injuries they sustained in a bus accident on September 29, 1986 on Interstate 295 in Salem County, New Jersey. Joe Martinez, Mary Martinez's husband, also brought suit for damages to their marital relationship. Prior to trial, the parties agreed that the substantive tort law governing the case would be that of New Jersey.

A jury in the Circuit Court for Baltimore City returned verdicts for all three plaintiffs, but declined to award punitive damages. Estella Black was awarded $370,022.12, Mary Martinez $1,053,773.08, and Joe Martinez $53,312.82. Following the trial, Leatherwood requested that the jury's award to Mary and Joe Martinez be consolidated and reduced pursuant to Md.Cts. & Jud.Proc.Code Ann., § 11–108 (1974, 1989 Repl.Vol.) (the $350,000 "cap" on noneconomic damages in personal injury cases). The trial judge declined to make any adjustment to the judgment awarded by the jury.

Both sides have appealed from the judgment of the circuit court. Appellants contend that the trial judge erred in his instructions to the jury on the issue of punitive damages. Leatherwood, on the other hand, claims that the trial judge erred when he failed to apply the "cap" on noneconomic

damages and reduce the jury's award to Mary and Joe Martinez. Leatherwood then argues that, assuming that the cap should have been applied, the loss of consortium claim of Mary and Joe Martinez should have been consolidated with Mary's individual claim and then reduced pursuant to the cap. Finding no error in the trial judge's rulings on the issues raised, we will affirm.

The facts are briefly stated. Appellants, residents of the District of Columbia and Virginia, were passengers on a bus owned by Leatherwood, then a Virginia corporation. The bus was travelling to Atlantic City, New Jersey, on September 29, 1986. An accident occurred which resulted in serious injuries to appellants. Appellants brought suit in the Circuit Court for Baltimore City against appellee and several other defendants, including the driver and the charter company.[1] Appellants filed a Notice of Intent to Rely on Foreign Law, specifically New Jersey law. All parties agreed from the outset that the case was to be governed by New Jersey substantive law. The trial judge granted summary judgment to appellants on the issue of liability, and the case proceeded to trial solely on the issue of damages. The jury returned the verdicts described *supra,* but declined to award any punitive damages. Following the trial, the trial judge declined Leatherwood's request, pursuant to Md.Cts. & Jud.Proc.Code Ann., § 11–108, to reduce the noneconomic damages awarded by the jury. This appeal and cross-appeal followed.

## JURY INSTRUCTION ON PUNITIVE DAMAGES[2]

Following the trial judge's instructions to the jury, Leatherwood requested that the trial judge provide an additional instruction to the jury on the issue of punitive damages. Leatherwood argued that the trial judge's original instruc-

---

1. Neither the driver nor the charter company are parties to the present appeal.

2. As a preliminary matter, as discussed *supra,* the substantive aspects of this case are governed by New Jersey law, while Maryland law is determinative of the procedural aspects of the case. Thus, the sub-

tion on the issue was inadequate because it failed to point out that negligence, even gross negligence, was insufficient to support an award of punitive damages. During a lengthy argument prior to the trial judge's additional instruction, appellants argued that no such additional instruction was necessary because Leatherwood's requested instruction was fairly covered in the trial judge's original charge to the jury. Appellants alternatively argued that, if the proposed instruction were given, some definition of the term "gross negligence" was required.

After initially indicating that he would not provide any additional instructions on the issue of punitive damages, the trial judge changed his mind. He stated to the jury:

"Counsel have asked that I clarify two things, so let me do that now. With regard to the punitive damages that I instructed you on, I want to make it clear that for you to find that punitive damages are supportable, something more than the mere commission of a wrong is required for punitive damages. Mere negligence is not enough, even if the negligence is so extreme in degree as to be characterized as gross negligence.

"For you to find that punitive damages are supported, it must go beyond even that."

Appellants excepted to this instruction, raising two issues: that the instruction was unnecessary because the trial judge's original instructions fairly covered the issue; and that the instruction was improper and confusing because it was taken out of context from a New Jersey appellate opinion on punitive damages.[3]

On appeal, appellants contend (1) that the challenged instruction was covered in the trial judge's original instruc-

---

stance of the trial judge's jury instructions is governed by New Jersey law, while the preservation of objections to those instructions and the manner in which they are given is determined by Maryland law.

**3.** After the additional instruction on punitive damages, counsel for appellants made the following objection:

tions on the issue; (2) that the challenged instruction failed to provide a definition of the term "gross negligence"; (3) that, by stating that "counsel have asked," the trial judge implied that both sides requested the additional instruction; and (4) that by quoting one sentence from a New Jersey case out of context, the trial judge's additional instruction increased the likelihood of confusion on the part of the jury.

Leatherwood argues that the second and third issues raised by appellants were not preserved for our review because appellants did not raise these grounds when they excepted to the trial judge's additional instruction on punitive damages. Based on our review of the record, as outlined earlier, we agree that the second and third issues were not properly preserved. We explain.

Rule 2–520 sets forth the procedures for a trial judge's instructions to the jury in a civil case. Rule 2–520(a) mandates that the trial judge instruct the jury at the conclusion of the evidence and before closing arguments by counsel. The instructions may be given orally or in writing, verbatim as requested by counsel or in the court's own words, or by any combination of these methods. Rule 2–520(b).

In objecting to instructions as given, counsel must object "on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Rule 2–520(e). The purpose of this requirement is to allow the trial judge an opportuni-

---

"The problem I have is that, number one, I feel that the particular charge that you gave additionally was already covered by the previous instruction.

"Number two, you singled out—and this is the biggest problem— you singled out one sentence, one phrase, from the entire process of the instruction, so now the jury is left with the impression of this one sentence. Now, I understand Your Honor has already made your decision to do this, and I can't change that. But in an effort to be fair, I think that ... to be fair that your read the entire instruction because it goes beyond that, Your Honor. All we have to show is willful and wanton disregard."

ty to correct or supplement his instructions. *Barone v. Winebrenner,* 189 Md. 142, 145, 55 A.2d 505 (1947).

Upon objection to the instructions given, the trial judge has the power and discretion to amplify his or her charge to the jury to cover the law of the case. *Wood v. Abell,* 268 Md. 214, 235, 300 A.2d 665 (1973). In the event additional instructions are given, once again, the trial judge is not bound to use the words of counsel, but may orally express the additional instructions to the jury in his or her own words. Rule 2–520(c).

Upon the giving of additional instructions, the requirements of Rule 2–520(e) remain fully applicable; that is, "a party must fully comply with the requirements of the rule at every stage of the instructions in order to preserve his rights; otherwise there is nothing for us to consider on an appeal." *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 612, 143 A.2d 627 (1958).

■ In this case, although appellants objected to Leatherwood's proposed additional instruction before it was given on the second issue raised on appeal (that no definition of gross negligence was provided), they failed to renew the objection on this ground in their post-instruction exceptions to the additional instruction as given. Thus, this issue is not preserved for our review. *Greenbelt Coop. Publishing Ass'n v. Bresler,* 253 Md. 324, 380, 252 A.2d 755 (1969), *rev'd on other grounds,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Morris v. Peace,* 14 Md.App. 681, 687, 288 A.2d 600, *cert. denied,* 266 Md. 740 (1972) (appellate court will only address those objections made at the conclusion of the trial judge's charge to the jury).[4]

■ With respect to appellants' third point discussed *supra,* that the trial judge's language left the impression

---

4. In interpreting Rule 4–325(e), the criminal counterpart to Rule 2–520(e), the Court of Appeals has warned:

"We have said that under certain well-defined circumstances, when the objection is clearly made before instructions are given, and restating the objection after the instructions would obviously be a futile or useless act, we will excuse the absence of literal compliance

with the jury that both parties requested the additional instruction, this argument was never raised at all in the trial court and was certainly not preserved. Rule 8–131(a).

■ Appellants did preserve their first and fourth arguments about the trial judge's additional instruction to the jury on punitive damages. First, appellants argued that the additional instruction had already been covered by the trial judge's previous instruction. While this assertion is arguably correct, appellants have failed to demonstrate on appeal how this repetition resulted in prejudice to their case. Trial judges, in their discretion, may decline to give a requested instruction when the substance of the instruction was fairly covered by other instructions. *Myers v. Estate of Alessi*, 80 Md.App. 124, 132, 560 A.2d 59, *cert. denied*, 317 Md. 640, 566 A.2d 101 (1989). This discretion, however, runs both ways; a trial judge may also, in his or her discretion, repeat an instruction which the trial judge feels may have been insufficient or erroneous when originally given. *Wood*, 268 Md. at 235, 300 A.2d 665; *Fisher v. Baltimore Transit Co.*, 184 Md. 399, 402, 41 A.2d 297 (1945). In the absence of some claim of prejudice, we see no error in the trial judge's instruction based on appellants's first argument.

---

with the requirements of the Rule. We make clear, however, that these occasions represent the rare exceptions, and that the requirements of the Rule should be followed closely. Many issues and possible instructions are discussed in the usual conference that takes place between counsel and the trial judge before instructions are given. Often, after discussion, defense counsel will be persuaded that the instruction under consideration is not warranted, and will abandon the request. *Unless the attorney preserves the point by proper objection after the charge, or has somehow made it crystal clear that there is an ongoing objection to the failure of the court to give the requested instruction, the objection may be lost."* *Sims v. State*, 319 Md. 540, 549, 573 A.2d 1317 (1990) (citations omitted) (emphasis added). Because Rules 2–520(e) and 4–325(e) contain identical language, we see no reason why this rationale should not apply with equal force in the civil context. In this case, there is nothing "crystal clear" about appellants' pre-instruction objections which indicates that they intended any continuing objection.

■ Appellants's fourth argument is that the trial judge erred by instructing the jury based on a single sentence from a New Jersey case on punitive damages. The trial judge's additional instruction on the issue of punitive damages was taken from *Enright v. Lubow,* 202 N.J.Super. 58, 493 A.2d 1288, 1297–1298 (1985), *cert. denied,* 104 N.J. 376, 517 A.2d 386, *aff'd on motion for reconsideration,* 215 N.J.Super. 306, 521 A.2d 1300, *cert. denied,* 108 N.J. 193, 528 A.2d 19 (1987), in which the New Jersey Superior Court held:

> "Something more than mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interest of others that the conduct may be called willful or wanton. There is a general agreement that, because it lacks this element, *mere negligence is not enough, even though it is so extreme in degree as to be characterized as 'gross' negligence.* To satisfy the requirement of willfulness or wantonness there must be a positive element of conscious wrongdoing. That requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences. Otherwise stated, punitive damages are sums awarded when the wrongdoer's conduct is especially egregious." (Citations omitted).

The trial judge used the highlighted language as the basis for his additional instruction to the jury on punitive damages. While we agree with appellants that the trial judge might well have given the entire passage cited above in order to place the additional instruction in some context, we cannot say that his failure to do so constitutes error. The trial judge had previously instructed the jury on punitive damages and had provided much of the material in the *Enright* passage quoted above in those original instruc-

tions.  In *Wood*, the Court of Appeals specifically rejected the argument, which appellants make here, that the additional instructions failed to take into account the entire law governing the case.

> "It seems to us that in contending the supplemental instructions failed to take into account the plaintiffs' burden of proving negligence and proximate cause, Wood has plainly overlooked the instructions to that effect previously given by [the trial judge]."

*Wood*, 268 Md. at 235, 300 A.2d 665.  In this case, appellants voiced no complaints over the trial judge's original instructions on the issue of punitive damages.  Considering the charge as a whole, *Wood*, 268 Md. at 235, 300 A.2d 665, we therefore hold that the trial judge did not err in failing to instruct the jury in the manner suggested by appellants.

## THE CAP ON NONECONOMIC DAMAGES [5]

■ This case arose from a bus accident which took place in New Jersey.  Pursuant to Md.Cts. & Jud.Proc.Code Ann., § 10–504 (1974, 1989 Repl.Vol.), plaintiffs, before trial, filed a Notice of Intent to Rely on Foreign Law.  All parties and the trial judge agreed that, pursuant to the conflict of laws principle of *lex loci delicti*, the substantive tort law governing this case was that of New Jersey.  Under the rule of *lex loci delicti*, the substantive law is determined by the place of wrong (New Jersey), while the procedural law is governed by the law of the forum (Maryland).  *Jacobs v. Adams*, 66 Md.App. 779, 790, 505 A.2d 930 (1986).  Maryland, unlike the majority of other states,[6] continues to adhere to traditional *lex loci delicti* analysis in the torts

---

**5.** Because the cross-appeal, unlike the instruction issue discussed earlier, is directed only at the judgments in favor of Mary and Joe Martinez, we shall refer to the cross-appellees in this discussion as "the Martinezes."  We note, however, that the same counsel represented both the Martinezes and Black at trial and on appeal.

**6.** A significant majority of states have adopted one of several "interest" or "contact" analyses, by which the substantive law to be applied is determined by the state with the most "significant contacts" or

area. *Hauch v. Connor,* 295 Md. 120, 125, 453 A.2d 1207 (1983); *White v. King,* 244 Md. 348, 352–355, 223 A.2d 763 (1966).

In its cross-appeal, Leatherwood contends that the trial judge erred when he failed to apply the $350,000 "cap"

---

"interest" in the outcome of the case. Our research has revealed that the highest courts of only seven other states have applied the doctrine of *lex loci delicti* within the past decade without later overruling it. *See Fitts v. Minnesota Mining & Mfg. Co.,* 581 So.2d 819, 823 (Ala. 1991); *Ling v. Jan's Liquors,* 237 Kan. 629, 703 P.2d 731, 735 (1985); *Braxton v. Anco Elec., Inc.,* 330 N.C. 124, 409 S.E.2d 914, 915 (1991); *Owen v. Owen,* 444 N.W.2d 710, 711 (S.D.1989); *McReynolds v. Cherokee Ins. Co.,* 815 S.W.2d 208, 211 (Tenn.App.1991); *McMillan v. McMillan,* 219 Va. 1127, 253 S.E.2d 662, 663–664 (1979); *Paul v. National Life,* 177 W.Va. 427, 352 S.E.2d 550, 555–556 (1986). While there are opinions that are still good law from the Supreme Courts of Nevada, South Carolina and Wyoming on this issue, they are all more than a quarter-century old, and their continued vitality is therefore questionable. *See Karlsen v. Jack,* 80 Nev. 201, 391 P.2d 319, 320 (1964); *Oshiek v. Oshiek,* 244 S.C. 249, 136 S.E.2d 303, 305 (1964); *Ball v. Ball,* 73 Wyo. 29, 269 P.2d 302, 304 (1954). On Nevada law, *compare Hanley v. Tribune Pub. Co.,* 527 F.2d 68, 69 (9th Cir.1975) (assuming without deciding that Nevada would adopt the Second Restatement "significant contacts" test) and *Laxalt v. McClatchy,* 116 F.R.D. 438, 447–449 (D.Nev.1987) (predicting Nevada's continued adherence to *lex loci delicti*). The Georgia Supreme Court has not specifically addressed tort choice of law issues since 1908, although the Georgia Court of Appeals has consistently applied the doctrine of *lex loci delicti. See, e.g., Risdon Enterprises, Inc. v. Colemill Enterprises, Inc.,* 172 Ga.App. 902, 324 S.E.2d 738, 740 (1984). The New Mexico Supreme Court has not addressed this issue in over 30 years, *see Zamora v. Smalley,* 68 N.M. 45, 358 P.2d 362, 363 (1961), and although the court held that *lex loci delicti* applied, it has been suggested that, because there was no conflict between the law of the two states in that case, this holding was dictum. *First Nat'l Bank in Albuquerque v. Benson,* 89 N.M. 481, 553 P.2d 1288, 1291, *cert. denied,* 90 N.M. 7, 558 P.2d 619 (1976) (Hernandez, J., dissenting). Two other states, Montana and Utah, do not appear to have ever decided these choice of law issues. Both states have been invited to adopt one of the "modern" doctrines, but both have either declined or avoided the necessity of doing so. *See Kemp v. Allstate Ins. Co.,* 183 Mont. 526, 601 P.2d 20, 23 (1979) (avoiding, by statutory construction, the need to decide whether to adopt what the court termed the "revisionist" position of the Restatement (Second) in the area of contracts); *Rhoades v. Wright,* 622 P.2d 343, 351 (Utah 1980) ("leaving for another day" the issue of whether to adopt the "governmental interests" analysis for choice of law issues). No prior cases of either state address these issues, so it is

on noneconomic damages set forth in Md.Cts. & Jud.Proc. Code Ann. § 11–108 to the jury's award of $800,000 in noneconomic damages to Mary Martinez. Furthermore, argues Leatherwood, the loss of consortium award to Mary Martinez and her husband Joe should be consolidated with the $800,000 awarded to Mary Martinez and then reduced pursuant to the cap. The essence of Leatherwood's claim is that the cap is part of the procedural law of Maryland and thus, under *lex loci delicti*, the procedural law of the forum should govern. The Martinezes, on the other hand, contend that the cap is substantive in nature and thus application of Maryland substantive law is barred under the rule of *lex loci delicti*. Because New Jersey has no cap on noneconomic damages similar to § 11–108, the Martinezes argue that they are entitled to recover the full amount of the jury verdict for noneconomic damages. We will hold that the statutory cap on noneconomic damages is part of the substantive law of Maryland and thus it is inapplicable to this case. Even in those jurisdictions which adhere to the principle of *lex loci delicti*, an exception is recognized where there is an overriding public policy reason to apply the law of the forum. There is no such overriding public policy reason to apply Maryland law under the circumstances of this case. We explain.

Leatherwood argues, using language from several cases upholding the constitutionality of the cap, that, because the cap does not interfere with a plaintiff's actual cause of action, it is a "remedy" which should be viewed as part of the procedural law of Maryland. Leatherwood relies heavily on language from *Edmonds v. Murphy*, 83 Md.App. 133, 573 A.2d 853 (1990), *aff'd*, 325 Md. 342, 601 A.2d 102 (1992), and *Potomac Elec. Power Co. v. Smith*, 79 Md.App. 591, 558 A.2d 768, *cert. denied*, 317 Md. 393, 564 A.2d 407 (1989). In *Edmonds*, we held:

---

unclear whether they would now adhere to the doctrine of *lex loci delicti*.

" 'A remedy is a matter of law, not a matter of fact. A trial court applies the remedy's limitation only *after* the jury has fulfilled its fact-finding function. Thus, [the cap] does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process.' "

*Edmonds*, 83 Md.App. at 144–145, 573 A.2d 853, quoting *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525, 529 (1989) (emphasis in original). Leatherwood seizes on our use of the term "remedy" to describe the cap to support its argument that the cap is procedural.

Leatherwood employs a similar strategy in interpreting language from *Smith*. In *Smith*, we held:

"Limitation of the jury's determination of damages in a statutorily-created cause of action is a proper modification of the remedy available in such actions and does not violate Article 23 of Maryland's Declaration of Rights."

*Smith*, 79 Md.App. at 628, 558 A.2d 768. Focusing again on the use of the term "remedy," Leatherwood argues that this usage indicates that the cap is procedural rather than substantive.

We disagree with Leatherwood's analysis, for two reasons. First, as the Martinezes point out, the question is not whether the statute in question is a "remedy," but whether it is "procedural." Because a particular law is properly characterized as a remedy or remedial does not mean that it is by definition procedural. Second, neither *Edmonds* nor *Smith* were concerned with the issue now before us—application of the cap statute in conflict of laws situations. *Edmonds* concerned the constitutionality of the cap statute, while *Smith* addressed whether the cap applied in wrongful death cases. Leatherwood's selective use of language from cases addressing issues only tangentially related to those now before us is not persuasive.

Furthermore, as the Martinezes point out, the Restatement (First) of Conflict of Laws and cases from other states support the proposition that a statutory limit on damages is

properly characterized as substantive rather than procedural law. While acknowledging that no Maryland cases have addressed the specific question now before us, the Martinezes argue that the Restatement and other state cases demonstrate that the cap is substantive in nature. We agree.

■ Because Maryland is among the few states that continue to adhere to the traditional conflict of laws principle of *lex loci delicti*, the First Restatement of Conflict of Laws, while of merely historical interest elsewhere, continues to provide guidance for the determination of *lex loci delicti* questions in Maryland. Section 412 of the First Restatement of Conflict of Laws provides guidance on the question now before us:

"The measure of damages for a tort is determined by the place of wrong."

Comment a to § 412 states:

"a. *Rationale.* The right to damages in compensation or punishment for a tort is to be distinguished from the right of access to the courts and from the procedure provided to obtain the damages. The creation of a right to have damages necessarily involves the measurement of that right in so far as the law can measure it. While the actual finding of the amount of damages is a function of the jury or other fact-finding body at the forum, the law that creates the right determines what items of loss are to be included in the damages. Since the right is created by the law of the place of wrong, it is measured by that law."

Section 412 has been cited with approval by the Court of Appeals in *Steger v. Egyud*, 219 Md. 331, 337, 149 A.2d 762 (1959), which also involved a case litigated in Maryland over a traffic accident which took place in New Jersey. The Court of Appeals held that "New Jersey law applies and controls all matters of substance, including the extent of liability and *the right to, and measure of,* contribution." *Steger*, 219 Md. at 337, 149 A.2d 762 (emphasis added).

Furthermore, several other states have adopted this reasoning in applying the rule of *lex loci delicti*.[7]

In *Chavarria v. Superior Court of Fresno County*, 40 Cal.App.3d 1073, 115 Cal.Rptr. 549 (1974), the question was whether a California statute providing for double damages in certain labor cases would apply if the case were transferred to Texas. The California Court of Appeals for the Fifth District held that "Texas considers the measure of damages to be a substantive matter controlled by the law of the state where the injury occurred.... A question of damages pertains to the right, not to the remedy and is not governed by the law of the forum." *Chavarria*, 115 Cal.Rptr. at 551.

In *Zotta v. Otis Elevator Co.*, 64 N.J.Super. 344, 165 A.2d 840 (1960), a New Jersey resident suffered injuries while working in a Pennsylvania elevator shaft. The injured worker obtained workers' compensation benefits through both Pennsylvania and New Jersey, which credited the Pennsylvania award against its own. In the injured worker's New Jersey suit against the elevator company, Otis moved to file a third party complaint against the worker's employer for contribution. Pennsylvania law permitted such a claim, while New Jersey law did not. The New Jersey Superior Court held that, since the accident occurred in Pennsylvania, its substantive law determined the right and quantum of recovery. *Zotta*, 165 A.2d at 842.

In *Victor v. Sperry*, 163 Cal.App.2d 518, 329 P.2d 728 (1958), a California resident suffered injuries resulting from a car accident in Mexico. Defendants were also residents of California. The trial judge applied Mexican law to the case, which resulted in a significant limitation on the plaintiff's recovery of damages. On appeal, the Superior Court, quoting § 412 of the Restatement of Conflicts, *see supra*, held that, since the accident arose in Mexico, the "character

---

7. Although both California and New Jersey have since abandoned the rule of *lex loci delicti*, these opinions remain persuasive authority for those states, such as Maryland, which continue to adhere to the traditional conflicts rules of the First Restatement.

and measure" of plaintiff's damages were governed by Mexican law. "The measure of damages is inseparably connected to the cause of action and cannot be severed therefrom." *Victor,* 329 P.2d at 731.

In the instant case, we hold that the cap on noneconomic damages is directly analogous to the New Jersey contribution statute, the California statute providing for double damages, and the Mexican law limiting the character and amount of damages in personal injury cases. As in *Chavarria, Zotta,* and *Victor,* and as set forth in Restatement (First) of Conflicts, the "creation of a right to have damages necessarily involves the measurement of that right in so far as the law can measure it." Restatement (First) of Conflicts, § 412, comment a. Based on *Steger* and the Restatement (First) of Conflicts, we hold that the statutory cap on noneconomic damages is a part of the substantive law of Maryland. Therefore, it is inapplicable to this case, which is governed by the substantive law of the *lex loci delicti,* New Jersey.

While this is the end of our inquiry for the purposes of *lex loci delicti* analysis, both § 612 of the Restatement (First) of Conflicts and several Maryland cases suggest that, where an overriding issue of the forum's public policy is at stake, such public policy may provide a sufficient basis for overruling the principle of *lex loci delicti* and applying forum law to the case. Leatherwood argues that the public policy of Maryland, as reflected by the Legislature's adoption of the cap on noneconomic damages, is of sufficient importance for us to override the principle of *lex loci delicti* and apply Maryland law. Under the circumstances of this case, we do not agree.

We have found no modern Maryland cases which have, in fact, invalidated the *lex loci delicti* rule on public policy grounds, although the Court of Appeals has on several occasions suggested this possibility. *Harford Mut. Ins. Co. v. Bruchey,* 248 Md. 669, 674, 238 A.2d 115 (1968); *Texaco, Inc. v. Vanden Bosche,* 242 Md. 334, 340, 219 A.2d 80 (1966)

("Recent legal thinking is that a public policy which will permit a state to refuse to enforce rights created by the law of a sister state must be very strong indeed."). These cases clearly indicate that the party seeking to apply Maryland law on public policy grounds bears a "heavy burden." *Bruchey,* 248 Md. at 674, 238 A.2d 115. Both cases concluded that the burden of persuasion had not been met. In *Bruchey,* the Court of Appeals held that the public policy behind Maryland law allowing recovery for loss of consortium was not sufficient to invalidate the application of Virginia law under the rule of *lex loci delicti,* although Virginia law did not allow loss of consortium claims. "We see here merely a difference of law between the place of the wrong and the forum and not an overriding public policy of the forum." *Bruchey,* 248 Md. at 675–676, 238 A.2d 115. In *Vanden Bosche,* the Court of Appeals indicated, but did not decide, that Virginia law, imposing personal liability on corporate officers who fail to fulfill certain procedural requirements, would be valid in a lawsuit in Maryland. *Vanden Bosche,* 242 Md. at 340–341, 219 A.2d 80.

Three cases of this Court have considered and rejected public policy challenges to the rule of *lex loci delicti.* In *Linton v. Linton,* 46 Md.App. 660, 420 A.2d 1249 (1980), this Court held that the public policy behind the Maryland principle of interspousal immunity in tort cases was not a sufficient basis for overruling the principle of *lex loci delicti.*

> "Maryland public policy is not so strong as to prohibit a spouse from recovering against the other spouse in the courts of this State if the action is permitted by the *lex loci delicti.* Our public welfare, health, and morals will not be endangered by allowing such suits to proceed to judgment."

*Linton,* 46 Md.App. at 667, 420 A.2d 1249 (footnote omitted). In *Rhee v. Combined Enterprises, Inc.,* 74 Md.App. 214, 536 A.2d 1197, *cert. granted sub. nom., Rhee v. Rhee,* 313 Md. 9, 542 A.2d 845, *cert. dismissed,* 314 Md. 123, 549 A.2d 385 (1988), we followed the reasoning of *Linton:* "The

question is whether the public policy of Maryland as the forum domicile is offended by the *lex loci delicti*. We held in *Linton* and reaffirm today that it does not." *Rhee*, 74 Md.App. at 225, 536 A.2d 1197.

In *Jacobs v. Adams*, 66 Md.App. 779, 505 A.2d 930 (1986), the question was whether the District of Columbia no-fault insurance law was offensive to Maryland public policy. Recalling *Bruchey* and *Vanden Bosche*, Judge Bloom wrote:

> "We must caution that 'public policy' is not a term to be bandied about lightly in every conflict of laws case. One should be well convinced of the weight of a supposed policy before advancing it against bedrock legal principles."

*Jacobs*, 66 Md.App. at 793, 505 A.2d 930. Judge Bloom concluded that the District of Columbia no-fault law was not offensive to any Maryland public policy. *Jacobs*, 66 Md.App. at 794, 505 A.2d 930.

While no Maryland cases have actually utilized a public policy rationale to invalidate the rule of *lex loci delicti*, the Court of Appeals, on at least two occasions, has applied public policy to override the corollary principle of *lex loci contractus*. In *Jennings v. Government Employees Ins.*, 302 Md. 352, 488 A.2d 166 (1985), the Court of Appeals held that "a clause in an insurance policy, which is contrary to the 'public policy of this State, as set forth in ... the Insurance Code' or other statute, is invalid and unenforceable." *Jennings*, 302 Md. at 356, 488 A.2d 166, quoting *Guardian Life Ins. v. Insurance Comm'r*, 293 Md. 629, 643, 446 A.2d 1140 (1982).

In *Bethlehem Steel v. G.C. Zarnas & Company*, 304 Md. 183, 498 A.2d 605 (1985), the Court of Appeals held that a provision in a contract by which an indemnitor agreed to indemnify an indemnitee against damages resulting from the sole negligence of the indemnitee was contrary to Maryland public policy and thus unenforceable. *Bethlehem Steel*, 304 Md. at 188–193, 498 A.2d 605. In his opinion, Judge Eldridge wrote:

> "This is not a situation where Maryland law is simply different from the law of another jurisdiction. Here, the General Assembly of Maryland has specifically addressed clauses in construction contracts providing for indemnity against the results of one's sole negligence, and has unequivocally told the Maryland judiciary that such a clause 'is void and unenforceable.' § 5–305 of the Courts and Judicial Proceedings Article."

*Bethlehem Steel,* 304 Md. at 190, 498 A.2d 605.

In *Hart v. Allstate Ins. Co.,* 83 Md.App. 642, 577 A.2d 373, *cert. granted,* 321 Md. 225, 582 A.2d 531 (1990), this Court, following *Jennings* and *Bethlehem Steel,* held:

> "The question whether Maryland's public policy is sufficiently strong to preclude application of another state's law involves more than a determination that the law of the two states is different. It is sufficiently strong where the General Assembly of Maryland has specifically addressed the issue and 'has unequivocally told the Maryland judiciary that [it] is void and unenforceable.' In such case, the rule of *lex loci contractus* will not apply if the law of the other state is contrary to Maryland law."

*Hart,* 83 Md.App. at 647, 577 A.2d 373, quoting *Bethlehem Steel,* 304 Md. at 190, 498 A.2d 605. We held in *Hart* that a household exclusion provision in an insurance policy was against Maryland public policy and thus refused to enforce it, although it was permitted by the law of Florida. *Hart,* 83 Md.App. at 648, 577 A.2d 373.

While *Jennings, Bethlehem Steel,* and *Hart* indicate that there are circumstances in which a Maryland public policy is sufficiently strong to invalidate the rule of *lex loci contractus,* in at least one other situation, however, the Court of Appeals has considered and rejected public policy challenges to the *lex loci contractus* rule. In *Kramer v. Bally's Park Place,* 311 Md. 387, 535 A.2d 466 (1988), the Court of Appeals held that a contract for gambling debts, made in New Jersey where gambling was legal, was enforceable in Maryland even though the type of gambling involved was affirmatively illegal in Maryland. *Kramer,* 311 Md. at 393,

535 A.2d 466. In reaching this conclusion, Judge Eldridge noted that there are several forms of gambling that are legal in Maryland, which suggests that Maryland cannot be said to have a public policy against gambling *per se*. "In light of ... the extent of legal gambling in Maryland, we cannot conclude that there is a sufficiently strong Maryland public policy against gambling debts that would justify disregarding the *lex loci contractus* principle." *Kramer*, 311 Md. at 396, 535 A.2d 466.

At oral argument, Leatherwood suggested, without explanation, that the *lex loci contractus* cases were applicable to the case now before us. Without deciding the applicability of the *lex loci contractus* rationale to this case, we hold that Leatherwood has not met its burden of showing a sufficiently strong public policy basis for applying the cap on noneconomic damages to this case. At the time of the accident, Leatherwood was a foreign (Virginia) corporation, and the Martinezes were residents of Virginia. Apparently, the action was brought in Maryland primarily because Leatherwood's principal place of business had been moved to Maryland. At oral argument, we were informed that Leatherwood is no longer in business in any jurisdiction.

In *Murphy v. Edmonds*, 325 Md. 342, 369–370, 601 A.2d 102 (1992), in upholding the cap on noneconomic damages as constitutional, the Court of Appeals set forth the objectives or policy behind the enactment of the cap:

> "The General Assembly's objective in enacting the cap was to assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public.... A cap on noneconomic damages may lead to greater ease in calculating premiums, thus making the market more attractive to insurers, and ultimately may lead to reduced premiums, making insurance more affordable for individuals and organizations performing needed services."

In this case, however, failure to apply the cap will not advance or hinder the policy enunciated by the Court of Appeals. Had this suit been brought in New Jersey, the

cap would not have been applied. Companies such as Leatherwood know, or should know, that when they conduct business in other states, they are, subject to certain limitations, submitting themselves to the laws of those other states. Nothing in the record indicates that failure to apply the cap will result in an increase in insurance premiums or decrease the availability of insurance for Maryland residents. In short, the policies behind the cap on noneconomic damages are simply unaffected by our decision in this case. Thus, whatever public policy reasons might, in the right case, support an argument over application of the cap in place of the rule of *lex loci delicti* are simply not presented in this case. We hold that Leatherwood has not met its "heavy burden" of establishing that Maryland public policy is sufficiently strong to warrant overriding the rule of *lex loci delicti* and applying Maryland substantive law in this case. We expressly reserve judgment on the question of whether the public policy interests of the cap might support overruling the rule of *lex loci delicti* in different circumstances.

Because we have held that the cap is a matter of substantive Maryland tort law, we need not and do not reach the question of whether, under the cap, an award for loss of consortium should be merged with an award for compensatory damages.

JUDGMENTS AFFIRMED. COSTS TO BE PAID HALF BY APPELLANTS/CROSS–APPELLEES AND HALF BY APPELLEE/CROSS–APPELLANT.