691 A.2d 712

**Richard NAUGHTON**

v.

**Jacques BANKIER.**

**No. 881, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 28, 1997.

Reconsideration Denied April 29, 1997.

644

David H. Dickieson (Silverstein and Mullens, P.L.L.C., on the brief), Washington, DC, for appellant.

Mallon A. Snyder, Rockville, for appellee.

Argued before DAVIS, SALMON and THIEME, JJ.

THIEME, Judge.

This case involves an appeal and cross-appeal from the Circuit Court for Montgomery County wherein the trial judge refused to submit the issue of punitive damages to the jury under prevailing Delaware law, refused to strike the expert testimony of appellee's expert witness and compelled appellant to submit to a physical examination, deemed the contents of a manufacturer's warning labels to be inadmissible, and further refused to allow appellant to conduct a demonstration of the device which allegedly caused his injury. We shall vacate and remand.

## *Facts*

Appellant Major Richard Naughton, United States Air Force, a New York resident, and appellee Jacques Bankier, a Montgomery County resident, were social acquaintances who occupied neighboring beach houses in Dewey Beach, Delaware, during the summer of 1990. Both parties, as part of childish antics, engaged in water balloon battles and, specifically, in so doing, Bankier utilized a "toy" [1] called a "Winger." [2] The "toy" is similar to an 8–foot slingshot. It is designed to catapult water balloons over long distances at high rates of speed, and its operation requires three adults (or, conceivably, three children with the strength of adults): two to hold the

---

1. *Webster's New Collegiate Dictionary* defines "toy" as something for a *child* to play with. (Emphasis supplied.)

2. Those who may have been to an Orioles baseball game at Camden Yards or to Cole Field House at the University of Maryland may have seen hot dogs or wadded up T-shirts being shot into the stands (or, indeed, over the fence behind the score board) from center field or half-court by a "winger" or a similar device.

ends of the elastic while the third participant stretches the center, which cradles the projectile. This "toy" is capable of hurling projectiles over 70 yards at initial speeds approaching 240 miles per hour.

Bankier testified that on 25 August 1990, while under the influence of a disputed amount of alcohol, he, along with two cohorts, choosing to practice childish ways, used this toy to propel a water balloon through an open window into the residence of Naughton, thereby striking him and injuring his eye.

After it was determined that Bankier was a resident of Montgomery County, a complaint was filed in that jurisdiction,[3] and service of process was effectuated. A scheduling order was generated, wherein 1 July 1994 was the cut-off date for Bankier's expert witnesses to be named. The close of all discovery was originally mandated as 29 July 1994; this was extended by subsequent court order to 20 October 1994. No extensions of time for the parties to name experts were requested or granted.

Bankier filed a motion to dismiss Naughton's claim for punitive damages. Said motion was reviewed by a special master, and ultimately granted by Judge William Cave, sitting as a motions judge. Prior to trial, Naughton moved the court to reconsider the motion under Delaware law. The trial judge held the motion *sub curia* until the close of all evidence, whereupon he ruled that the issue of punitive damages would not be submitted to the jury.

At a settlement conference, attorney's fees were imposed against Bankier in the amount of $350.00, due to Bankier's insurance carrier's absence, in violation of the court's scheduling order,[4] and the fact that Bankier had no authority to enter into settlement negotiations or make a settlement offer.

---

3. *See* Md.Code Ann., Courts and Judicial Proceedings Article § 6–201.

4. The last paragraph of the Order for Settlement Conference provided: "Attendance at the Settlement Conference and good faith is mandatory for all attorneys, insurance adjustors and parties in this case,

During the month of August 1995, Bankier filed a motion to compel the physical examination of Naughton. On 31 August 1995, a motions judge granted the motion. On 22 September 1995, one business day before trial, Bankier named Dr. Brian Haas as an expert witness.

At trial, Naughton sought to have his expert, Dr. Michael Lemp, read manufacturer's warning labels and testify to the potential harm to an eye that a water balloon launched by the Winger could cause.[5] Naughton further requested to demonstrate to the jury the operation of the Winger. The trial judge denied both requests. The jury returned an award of compensatory damages in the amount of $16,109.00, $4,750.00 of which represented future medical expenses.

Additional facts will be supplemented as necessary.

Naughton presents the following issues for this Court's review:

1. Based upon prevailing Delaware law, did the trial court err in refusing to submit the issue of punitive damages to the jury?

2. Did the trial court err in failing to strike the testimony of appellee's expert witness, Dr. Brian Haas?

3. Did the trial court err in determining that the contents of manufacturer's warning labels were inadmissible?

4. Did the trial court err in refusing to allow appellant to demonstrate the use of the Winger to the jury?

In his cross-appeal, appellee presents the following issues:

5. Did the trial court err in submitting the issue of future medical expenses to the jury in the absence of sponsorship testimony?

---

Counsel must attend the Settlement Conference with full authority to make final and binding decisions related to settlement."

**5.** Bankier testified that when he purchased the Winger it was missing the warning labels that are usually sewn on the device by the manufacturer and, furthermore, that he was unaware of, and had never seen, cautionary advice for the slingshot.

6. Did the settlement judge abuse his discretion in ordering attorney's fees against appellee for failure to enter into settlement negotiations?

We shall answer "Yes" to questions 1, 2, and 6, reverse and remand issues 1 and 2, and reverse issue 6 without further disposition; we answer "No" to, and affirm, issues 3, 4, and 5.

## Discussion

## I.

Before addressing the merits of Naughton's contention that the trial court erroneously refused to submit the issue of punitive damages to the jury, it is incumbent upon this Court to acknowledge the issue of which state's substantive law on punitive damages, Maryland or Delaware, should be applied to the instant action. *See* Maryland Rule 8–131(a).

In situations when a cause of action accrues in one state and the adjudicatory forum of the action lies in another state, Maryland follows the conflict of laws principle of *lex loci delicti*. *Hauch v. Connor*, 295 Md. 120, 125, 453 A.2d 1207 (1983).[6] This results in the application of the procedural law of the forum state, and the application of the substantive law of the place (state) of the wrong. *Black v. Leatherwood Motor Coach Corp.*, 92 Md.App. 27, 37, 606 A.2d 295, *cert. denied, Leatherwood Motor Coach v. Martinez*, 327 Md. 626, 612 A.2d 257 (1992).

In *Black*, residents of Virginia brought an action in Maryland against a common carrier, for injuries sustained in a bus accident in New Jersey. This Court refused to apply Maryland's cap on non-economic damages, inasmuch as the cap is

---

6. Maryland is in the minority of states continuing to employ *lex loci delicti*, whereas the significant majority of states utilizes a "significant contacts or interests" analysis. Judge Rosalyn Bell, writing for this Court in *Black v. Leatherwood Motor Coach Corp.*, 92 Md.App. 27, 37–39 n. 6, 606 A.2d 295, *cert. denied, Leatherwood Motor Coach v. Martinez*, 327 Md. 626, 612 A.2d 257 (1992), embarked on a thorough discussion on the application of these alternative analyses. For a full discussion of this subject, consult Judge Bell's comprehensive review.

substantive in nature, and therefore should be governed by prevailing New Jersey law.

■ No matter the basis for utilizing the substantive law of a foreign jurisdiction, and although not yet decided by the Court of Appeals, we believe punitive damages, in and of themselves, to be of a substantive nature. Under *lex loci delicti*, they, like the statutory cap that establishes their maximum awardability, should also be governed by the law of the state in which the wrong occurred. Restatement of Conflict of Laws (First) § 412 harmonizes our position and states: "The measure of damages for a tort is determined by the place of wrong." In *Steger v. Egyud*, 219 Md. 331, 337, 149 A.2d 762 (1959), the Court of Appeals favorably referenced § 412 in the context of liability and contribution, and opined that, under this section, substantive matters concerning damages are governed by the place of the wrong in conflict of laws situations.

In factual postures similar to the case now before us, other jurisdictions have come to synonymous conclusions concerning the nature of punitive damages. In *Aerovias Nacionales De Colombia, S.A. v. Tellez*, 596 So.2d 1193 (Fla.App. 3 Dist.1992), the Florida intermediate appellate court determined that representatives of victims of an airline crash that occurred in New York were bound to the appropriate New York substantive law concerning punitive damages when suing in a Florida court. The Court of Appeals of Kansas, in a fashion akin to their Floridian brethren of the bench, determined that when legally pursuing an action for conversion in Kansas, the conduct forming the basis thereof occurring in Nebraska, Nebraska substantive law applies, thereby precluding the recovery of punitive damages. *North Central Kansas Production Credit Assoc. v. Odell Farmers Co-op Elevator Co.*, 722 P.2d 592 (Kan.App.1986) (per curiam).

■ Jury instructions are procedural in nature, no matter the substantive content contained therein. In a conflict of laws situation, the law of the forum state prevails as to their

administration. Maryland law shall accordingly be used in their assessment.

In determining the propriety of a trial court's determination to give a particular jury instruction, we must evaluate whether the law conveyed in the instruction is applicable in light of the evidence before the jury. *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123 (1992). Whether a particular instruction is warranted based on the evidence produced at trial is vested within the sound discretion of the trial judge. *Blaw–Knox Constr. Equip. Co. v. Morris,* 88 Md.App. 655, 596 A.2d 679 (1991).

Underlying Delaware's substantive law on punitive damages is the notion that:

> It is a well-established principle of the common law, that ... a jury may inflict what are called exemplary, punitive or vindictive damages upon a defendant, having in view the enormity of his offense rather than the measure of compensation to the plaintiff. . . . By the common as well as by the statute law, men are often punished for aggravated misconduct or lawless acts, by means of civil action, and the damages, inflicted by way of penalty or punishment, given to the party injured.

*Jardel Co. v. Hughes,* 523 A.2d 518, 528 (Del.1987), quoting *Day v. Woodworth,* 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851). In further delineating the standard under which the punitive damages are to be awarded, the Delaware Supreme Court, in *Strauss v. Biggs,* 525 A.2d 992, 999 (Del.1987), espoused:

> "Punitive damages are damages other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Jardel,* 523 A.2d at 529. (quoting Restatement (Second) of Torts, § 908 (1979)). "Conduct is 'outrageous' because of 'evil motive or reckless indifference to the rights of others.'" *Id.* (quoting Restatement (Second) of Torts, § 908, comment b (1979)). "The wilful or wanton standard necessary to justify imposi-

tion of punitive damages refers to a 'distinct state of mind, one a conscious awareness, the other a conscious indifference.' " *Id.*

*Id.*

■ Further elaborating on what constitutes "reckless indifference" in the context of punitive damages, the court more recently in *Tackett v. State Farm Fire and Cas. Ins. Co.*, 653 A.2d 254, 265 (Del.1995) (citations omitted), noted that "[i]t is not enough that a decision be wrong[,] [harm from a recklessly indifferent act] must result from a conscious indifference to the decision's foreseeable effect." It is required that the defendant foresee the potential harm to the plaintiff as a reasonable consequence of his unacceptable behavior. *Jardel,* 523 A.2d at 529–530.

It is often difficult to demonstrate one's mental state through direct evidence. "[W]e note that the problems involved in proving the existence of a person's state of mind necessitate some reliance on circumstantial evidence." *Stanley v. State,* 500 A.2d 581 (Del.1985).

"As a matter of common sense, in judging the sufficiency of the evidence as to the state of mind, the jury must be able to weigh the conduct of the defendant. *Otherwise, in most situations, the only evidence would be the defendant's own self-interested testimony.*"

*Plass v. State,* 457 A.2d 362, 365 (Del.1983) (emphasis supplied).

■ Reckless indifference, therefore, can readily be inferred from the defendant's behavior towards individuals situated similarly to plaintiff. *See, Cloroben Chemical Corp. v. Comegys,* 464 A.2d 887 (Del.1983).

■ Under the circumstances here present, sufficient evidence was generated to present the jury with the factual question of whether Bankier acted with the reckless indifference required by *Strauss, supra,* to award punitive damages. Bankier admitted on cross-examination that he propelled the water balloon in question through an open window and into

Naughton's beach house, thereby causing him injury. We think it clear that the hurling of a projectile, weighty or not, into a residential dwelling evidences a blatant and willful blindness for the readily foreseeable, substantial, and inherent risks associated with the projectile's striking someone inside.[7] Under Delaware law, it was therefore erroneous for the trial judge to refuse to submit the issue of punitive damages to the jury.

## II.

■ Montgomery County has implemented the use of administrative scheduling orders pursuant to Maryland Rule 2–504. The purpose of the rule is two-fold: to maximize judicial efficiency and minimize judicial inefficiency. Though such orders are generally not unyieldingly rigid as extraordinary circumstances which warrant modification do occur, they serve to light the way down the corridors which pending cases will proceed. Indeed, while absolute compliance with scheduling orders is not always feasible from a practical standpoint, we think it quite reasonable for Maryland courts to demand at least substantial compliance, or, *at the barest minimum,* a good faith and earnest effort toward compliance. *See Betz v. State,* 99 Md.App. 60, 635 A.2d 77 (1994).

■ The scheduling order in the instant case indicated that Bankier was to identify all its experts by 1 July 1994. It was, however, just one business day before trial, and more than one year past the expiration of the court-ordered disclosure period, that Bankier named Dr. Brian Haas as an expert witness. That is ludicrous. If scheduling orders are to be permitted to be treated in such a casual fashion, why bother with them?

---

7. In his brief and at oral argument, Bankier steadfastly took the position that by being in the residence at the time of the water balloon battle, Naughton impliedly consented to Bankier's arguably reckless conduct. Moreover, he maintains that because Naughton accepted his apology the morning after the incident, after all parties returned to states of sobriety, this too absolves Bankier of liability. These arguments parallel the original conduct that underlies the instant appeal.

██ The *pro forma* language of the scheduling order clearly states that "[i]t may not be modified except by leave of court upon a showing of good cause. . . ." The record is not only devoid of good cause which might warrant modification, it is also devoid of *any* reason why an expert witness should be named belatedly over one year after the expiration of the disclosure period and be allowed to testify. For a trial court to permit a party to deviate so from a scheduling order without a showing of good cause is, on its face, prejudicial and fundamentally unfair to opposing parties, and would further contravene the very aims supporting the inception of Rule 2–504 by decreasing the value of scheduling orders to the paper upon which they are printed.

We hold that the trial judge abused his discretion by allowing Dr. Haas to testify at trial on behalf of Bankier when counsel had disclosed him as a witness just one day before trial, in contravention of the scheduling order which remained in force.

Naughton additionally posits that it was erroneous for him to be compelled to submit to a physical examination by Dr. Haas, given that Bankier did not request such an examination until over one year after the expiration of the discovery period. He argues that the error was compounded when the trial judge opted to permit Haas to testify as to the observations that he gathered during his examination. Prior to trial, Naughton filed a motion to quash the examination that the trial court never ruled upon.

From the record before us, we can glean no evidence that Naughton ever renewed this motion at trial. Although we deem this argument to therefore be waived, *see* Maryland Rule 8–131(a), if the issue were properly before us, it would most probably be moot in accordance with our holding above.

### III.

Naughton's third assertion of error is that the trial judge impermissibly refused to allow his expert, Dr. Michael Lemp, an ophthalmologist, to testify as to the Winger's capability to

injure the eye in a manner similar to that sustained by Naughton, based upon the manufacturer's printed specifications as to the potential hazards of the Winger if used in a fashion other than that which was prescribed.

A potential expert witness must demonstrate at least a minimal amount of competence or knowledge in the area in which the individual purports to be an expert. *Stickell v. City of Baltimore,* 252 Md. 464, 250 A.2d 541 (1969). It is within the province of the trial judge to strike expert testimony if it is founded in pure conjecture rather than factually based opinion. *Franch v. Ankney,* 341 Md. 350, 364, 670 A.2d 951 (1996).

Dr. Lemp had been qualified previously as an expert in ophthalmology and testified as to his familiarity with and the extent of potential trauma to the eye in consequence of its being struck by a projectile. Before trial, Naughton's counsel suggested that Dr. Lemp was familiar with the types of things that can cause eye injuries and, specifically, the causal connection between the capabilities of the Winger as set forth in the manufacturer's warnings and the injuries sustained by Naughton.

The record reveals no evidence that Dr. Lemp had ever handled or used the Winger, or that he was qualified to comment as to its design and production. Dr. Lemp may have encountered injuries to the eye caused by many types of projectiles, but his dealing with *this particular device* was a case of first impression. Dr. Lemp was qualified as an expert witness based on his knowledge of medicine, not of engineering, and, without any personal familiarity with the workings of the Winger, he was unqualified to testify, even as a lay witness under the provisions set forth in Rule 5–701, as to the content of the warning labels that are traditionally affixed by the manufacturer. The trial judge was therefore correct as a matter of law in not allowing Dr. Lemp to read the warning labels into the record.

## IV.

 It is also Naughton's position that the trial judge erred in not allowing the operation of the Winger to be demonstrated for the benefit of the jury. Trial judges enjoy a generous amount of discretion in determining whether to allow a demonstration of evidence to occur in open court. *Smith v. State Rds. Com.*, 240 Md. 525, 214 A.2d 792 (1965). In reviewing such an issue, we give great deference to the lower court ruling, and will only reverse such a decision on appeal if the record plainly reveals an abuse of discretion. *Id.*

 If a demonstration of evidence is in fact to occur, it must be conducted under circumstances and conditions similar to those that existed in the case at issue. *O'Doherty v. Catonsville Plumbing & Heating Co.*, 269 Md. 371, 375, 306 A.2d 248 (1973), citing 29 Am.Jur.2d, *Evidence*, § 819. Moreover, the trial judge must, as a condition precedent to the demonstration, allow full argument on the need for a demonstration and its fairness.

 In the factual circumstances here present, it is this Court's position that the trial judge quite properly denied Naughton an opportunity to demonstrate the Winger and, accordingly, no abuse of discretion occurred. It would have been quite difficult, if not impossible, to imitate the conditions under which the instant cause of action accrued. As both parties agree, the slingshot is constructed of rubber and elastic, and requires three operators. Each of these components individually, and most certainly collectively, provides the opportunity for an amount of variation that would render the demonstration both scientifically and situationally unreliable.

Although not demonstrated, the Winger was received into evidence as an exhibit for Naughton.[8] When they retreated to

---

8. We assume that although Newtonian physics still has some residual contemporary relevance, trial counsel was of the opinion that jurors, nevertheless, still require expert testimony to persuade them that damage is quite probable as a result of an individual being struck by a heavy

the confines of the jury room for deliberations, the jurors, pursuant to Rule 2–521(a), had in their custody the actual device that allegedly caused Naughton's injury. It was therefore well within their province to examine the evidence and, conceivably, conduct a demonstration of the Winger within the jury room. To say that such a demonstration actually occurred would be pure speculation; however, it is far from an impossibility.

## *Cross-appeal*

## V.

In his cross-appeal, Bankier first contends that the trial judge erred in submitting to the jury the issue of future medical expenses, in that inadequate sponsorship testimony existed to this effect. The lower court denied Bankier's motion for judgment on this count, and the jury ultimately awarded $4,750.00 for future medical expenses.

■ It is well established that future damages must be established by, at least, reasonable probability, *Bartholomee v. Casey*, 103 Md.App. 34, 651 A.2d 908, *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1994); *Davidson v. Miller*, 276 Md. 54, 344 A.2d 422 (1975), and that such probability may not rest upon conjecture, speculation, or guess work on the part of the factfinder. *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 666, 464 A.2d 1020 (1983); *DiLeo v. Nugent*, 88 Md.App. 59, 592 A.2d 1126 (1991).

■ At trial, Naughton offered expert testimony that indicated Naughton's need for future annual eye examinations, not only for purposes of vision correction, but, more important, to assess and treat the manifestation of any chronic eye disease that might later arise as a result of his being struck by the water balloon launched by Bankier. It was well within the province of the jury to draw reasonable inferences from the

mass (here, a water-filled balloon capable of reaching speeds of 240 miles per hour).

testimony presented, and to base an award for future medical expenses therefrom.

During the course of a post-trial motions hearing on Bankier's motion for judgment notwithstanding the original verdict, the trial judge stated from the bench:

> ... I am satisfied that the jury properly considered this case and that the future medical expense is something within the province of the jury. And you do not have to have, I think, to meet the standard someone come in and say that the future medical expense will be X.
>
> It is something over which, I believe, the jury has within its dominion the ability to apply its common sense and knowledge of the society and the community.
>
> And once it has the information that an annual eye exam is required, and the life expectancy I think it can fairly conclude, and I think did fairly conclude the cost of that future medical expense....

In that we are in agreement with this position, we perceive no error in the submission of the issue of future medical expenses to the jury, and therefore affirm the lower court's ruling on that ground.

## VI.

Bankier further takes the position that the settlement judge abused his discretion in ordering attorney's fees as sanctions because of the unavailability of an authorized representative of his insurance carrier who could make a settlement offer.[9] While we are persuaded that an abuse of discretion did in fact occur, we reach this position based upon reasoning other than that which Bankier presents.

---

9. While an argument might be made that the award of sanctions could have been permissible based upon principles of contempt or maintaining a proceeding in bad faith or without substantial justification, as set forth in Maryland Rule 1–341, we need make no inference thereto, inasmuch as this was not the basis for the award in the instant case, nor was this rationale posited by either party.

Naughton quite commendably draws our attention to *Tobin v. Marriott,* 111 Md.App. 566, 683 A.2d 784 (1996). In *Tobin,* the Circuit Court for Montgomery County imposed sanctions in the amount of $750.00, payable to Marriott's counsel, for Tobin's failure to attend a court-ordered mediation conference. Judge Getty, writing for this Court from the western foothills of temperate wisdom opined:

> [W]e are unwilling to find some inherent authority to award sanctions of this kind for unexplained violations of a scheduling order. Except in the most extraordinary case, the Court has been consistently unwilling to allow trial courts to 'shift litigation expenses based on relative fault' . . . .

111 Md.App. at 575, 683 A.2d 784, quoting *Zdravkovich v. Bell Atlantic–Tricon Leasing Corp.,* 323 Md. 200, 212, 592 A.2d 498 (1991).

While the winds of change often blow fiercely in appellate courts, such is not the case today. Rather, "[l]ike some rock which stretches into the vast sea, and which exposed to the fury of the winds and beaten against by the waves, endures all the violence and threats of heaven and sea standing un-moved," [10] we, like a lighthouse of stability amid a sea of contention, continue to stand firmly footed on precedent, and reverse the settlement judge's imposition of attorney's fees in the amount of $350.00.

**JUDGMENT VACATED AND REMANDED FOR NEW TRIAL ON ALL COUNTS.**

**COSTS TO BE PAID BY APPELLEE.**

---

**10.** Vergil, Aeneid X/692.