925 A.2d 636

**ERIE INSURANCE EXCHANGE**

v.

**Edmund D. HEFFERNAN, II, et al.**

**Misc. No. 2, Sept. Term, 2006.**

Court of Appeals of Maryland.

June 13, 2007.

**600**

602

Charles E. Wilson, Jr. (Amy Leete Leone, McCarthy Wilson, Rockville), on brief for appellant.

Andrew Janquitto (Mudd, Harrison & Burch, L.L.P., Towson, Samuel H. Paavola, Annapolis), all on brief for appellees.

Argued before BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

We have before us two questions of law certified by the United States District Court for the District of Maryland pursuant to the Maryland Uniform Certification of Questions of Law Act (Maryland Code, §§ 12–601 through 12–613 of the Cts. & Jud. Proc. Article). The questions arise from an action by Edmund and Diane Heffernan ("the Heffernans"), Maryland residents, against Erie Insurance Exchange ("Erie").

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

The Heffernans seek damages pursuant to the uninsured/underinsured motorist coverage provisions in two insurance policies issued by Erie. The auto policy provides uninsured/underinsured motorists benefits in the amount of $300,000 per person/$300,000 per accident. A second policy, the personal catastrophe policy, provides an additional $1,000,000 in uninsured/underinsured motorists benefits. The parties were unable to come to an agreement on issues of liability and damages. As a result, the Heffernans filed suit against Erie in the Circuit Court for Baltimore City. Erie removed the case to the United States District Court for the District of Maryland.

The questions certified to us are:

1. In a case involving a claim for benefits pursuant to the uninsured/underinsured provisions of an automobile insurance contract executed in Maryland, where the car accident occurred in Delaware, should Maryland or Delaware law be applied to determine what the claimants would be "entitled to recover" because of the accident?

2. If Delaware law governs the tort issues of this case under *lex loci delicti*, would Maryland's public policy exception to that doctrine nonetheless require application of:

a. Maryland's statutory cap on non-economic damages, Md.Code Ann., Cts. & Jud. Proc. § 11–108, where the insured and the insurer both reside in Maryland, the covered automobiles are garaged in Maryland, and the contract was executed and administered in Maryland?

b. Maryland's contributory negligence principles?

In answer to the first question, the substantive law of Delaware applies to determine what the claimants would be "entitled to recover" because of the accident. In answer to the second question, Maryland's public policy exception to the doctrine of *lex loci delicti* does not require the application of Maryland's statutory cap on non-economic damages. Similarly, the public policy exception does not require the application of Maryland's contributory negligence principles.

## FACTS

We adopt the facts as recited in the Certification Order issued by the District Court in this case:

On April 18, 2003 at about 6:30 a.m., Mallory Heffernan, a minor, was fatally injured in an automobile accident that occurred on Route 301 in the State of Delaware. Ms. Heffernan (hereinafter "Decedent") was transported from the scene and taken to a Delaware hospital, where she subsequently died. The Decedent and another minor, Curtis Jones, had been passengers in a vehicle driven by John McMahon, Jr., also a minor, and owned by his mother, Angela McMahon. The accident occurred when John McMahon, Jr. apparently fell asleep at the wheel and collided with a tractor-trailer. At the time of the accident, the Decedent resided with her parents, Edmund and Diane Heffernan, in Queenstown, Maryland. The driver, John McMahon, Jr., and the other passenger, Curtis Jones, were step-brothers who resided with Mr. McMahon's father and Mr. Jones's mother in Ingleside, Maryland.

The group of teenagers, all Maryland residents, had driven from Maryland to Pennsylvania after school on April 17, 2003 in order to attend a concert in Allentown, Pennsylvania that night. After the concert, they began to make their way back to Maryland. The group first drove a friend home to Kutztown, Pennsylvania. After doing so, they became lost and called the Heffernans to help them get directions back to the highway. The group then drove another friend home to Swedesboro, New Jersey. The occupants of the McMahon vehicle were on their way back to Maryland, driving through Delaware, when the accident occurred at approximately 6:30 a.m. As planned prior to the trip, John McMahon, Jr. was the only individual in the group who drove the car throughout the entire trip to or from the concert.

At trial, [Erie] believes that it will introduce evidence that the Decedent called her parents at home in Maryland at least twice between midnight and 4:40 a.m., during their

drive back to Maryland. Further, [Erie's] evidence would show that, during these calls, the Decedent informed her parents that they were too tired to continue and requested her parents' permission to stop traveling for the night and sleep at the home of friends in either Kutztown, Pennsylvania or, later, in Swedesboro, New Jersey. [Erie] believes that it will present evidence showing that her parents refused these requests and demanded that the group continue the drive home.

At trial, [the Heffernans] believe that they will introduce evidence that there were telephone contacts between them and Mallory. Further, [the Heffernans] believe that they would present evidence that at no point during the entire evening were any requests made to them for permission to stop nor at any point were [the Heffernans] advised that the driver or any of the other persons in the vehicle being driven by John McMahon were suffering from fatigue.

At the time of the accident, the Decedent's parents, Edmund and Diane Heffernan, carried a Pioneer Family Auto Policy (# Q01 080493 M) and a Personal Catastrophe Policy (# Q31 2350156 M) with [Erie]. These are Maryland policies, designed to comply with Maryland mandatory insurance requirements, which were issued, sold and delivered in Maryland to Maryland residents, Edmund and Diane Heffernan. Their auto policy included underinsured motorists coverage in the amount of $300,000 per person/ $300,000 per accident; the catastrophe policy provided $1,000,000 in underinsured motorists coverage. It is agreed that the vehicle driven by Mr. McMahon was an underinsured motor vehicle with respect to the Erie policy.

The Heffernans and Erie were unable to come to an agreement on issues of liability and the amount of benefits to be paid, and the Heffernans filed suit against Erie in the Circuit Court for Baltimore City, Maryland, seeking damages pursuant to the underinsured motorists coverage. [Erie] then removed the case to the United States District Court for the District of Maryland. The underinsured motorists coverage in the Erie policies provided, in part that

Erie would pay damages (up to the applicable limits) "that the law entitles you" to recover from the owner or operator of an underinsured motor vehicle. [The Heffernans] have asserted that Maryland's non-economic damages cap, Md. Code Ann., Cts. & Jud. Proc. § 11–108, does not limit the damages available to them. [Erie] contends that § 11–108 applies to limit the damages available. In addition, [the Heffernans] assert that Delaware's tort law including the comparative negligence doctrine should be applied to determine whether, and to what extent, they are entitled to recover from the uninsured motorist. [Erie] contends that Maryland law, including the doctrines of contributory negligence and assumption of risk, should be applied.

## DISCUSSION

What is ultimately at issue in this case is whether, in determining what the law, and therefore the policies, entitle the insureds to recover, Maryland would apply its own law or Delaware law. The automobile liability insurance policies issued to the Heffernans by Erie in this case were issued in Maryland. As discussed, *supra,* at the time of the collision, the vehicle operated by Mr. McMahon was underinsured with respect to the uninsured/underinsured motorist provisions of the Erie policy because the damages the Heffernans seek exceed the tortfeasor's liability insurance policy limits. In *West American Ins. Co. v. Popa,* 352 Md. 455, 462–63, 723 A.2d 1, 4–5 (1998), we said that

> [u]nder the Maryland uninsured/underinsured motorist statutory provisions, when an insured under an automobile insurance policy has incurred damages as a result of the allegedly tortious driving by an uninsured or underinsured motorist, the insured has the option of initially bringing a contract action against his or her insurer to recover under the policy's uninsured/underinsured motorist provisions or of initially bringing a tort action against the tortfeasor. When the insured chooses the second option, and notifies his or her insurer of the tort action, the issues of the unin-

sured/underinsured defendant's liability and the amount of damages are resolved in the tort action.

(Citations omitted.) Here, the Heffernans chose to bring a contract action [1] against their insurer, Erie, and settled the tort claim against the underinsured tortfeasor, for the policy limits, which were $35,000.00. Erie waived any right to subrogation and allowed the Heffernans to accept the amount offered.

Erie contends that to determine an insurer's liability (what the Heffernans are "entitled to recover") amounts to an interpretation of the contract and that it was contemplated by both parties that the policies would be interpreted by referencing Maryland law only, despite the fact that the automobile collision occurred in Delaware. The issue, Erie asserts, is properly decided under Maryland contract law. In Erie's view, the interpretation of "entitled to recover" requires reference to "general principles of tort law" only and is not a mixed question of contract and tort law. Erie argues that because only the law of Maryland is implicated, it is not a choice of law issue. According to Erie, if the interpretation of "entitled to recover" presents a choice of law question, Maryland should discontinue its adherence to *lex loci delicti* and adopt a "most significant relationship" test. Additionally, Erie argues that the *renvoi* [2] doctrine should apply. Erie posits that, pursuant to the doctrine of *renvoi*, this Court would apply Maryland tort law to the extent that the contract interpretation requires reference to tort law. Lastly, Erie asserts that Maryland's public policy exception to *lex loci delicti* requires application

---

1. "The Insured has a third option of bringing both actions at the same time in the same case." *Lane v. Nationwide Mut. Ins. Co.,* 321 Md. 165, 170, 582 A.2d 501, 503 (*citing Allstate Ins. v. Miller,* 315 Md. 182, 553 A.2d 1268 (1989)).

2. The *renvoi* doctrine provides that "when the forum court's choice-of-law-rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules." *American Motorists Ins. Co. v. AR-TRA Group, Inc.,* 338 Md. 560, 570, 659 A.2d 1295, 1301–1302 (1995).

of Maryland's statutory cap and the principles of contributory negligence and assumption of the risk.

Conversely, the Heffernans contend that "contract and tort law converge in uninsured motorist coverage" and, as a result, contract principles should apply to certain portions of an action for uninsured motorist benefits and tort principles to other aspects. In the Heffernans' view, our interpretation of the phrase, "that the law entitles you," as it appears in the insurance policies (or "entitled to recover" as used in Md.Code (1997, 2006 Rep l. Vol.), § 19–509(c) of the Insurance Article) is a question of mixed law, contract and tort. The Heffernans take the position that because tort law varies from state to state, specifically the tort law of Delaware, the *situs* of the collision, is different from that of Maryland, the place where the contract was performed; hence, a conflict of laws exists. The Heffernans urge that this Court would apply the principle of *lex loci delicti* to resolve the conflict of laws, and, in doing so, apply the substantive tort law of Delaware to determine what they are "entitled to recover." Unlike Erie, the Heffernans urge that the doctrine of *renvoi* is inapplicable to the present case. Finally, the Heffernans argue that Maryland's non-economic damages cap and the rule of contributory negligence should not apply to preclude their recovery.

### A.

### Statutory Construction

This case calls for the construction of two identical phrases within two separate insurance policies issued by Erie to the Heffernans. Specifically, the policies provide that Erie will pay damages "that the law entitles you" to recover from an uninsured/underinsured motorist. We assume *arguendo*, that the coverage provided for under the policies was designed to comply with Maryland's uninsured motorist statute, § 19–509 of the Insurance Article.[3] We note that "[t]he Erie

---

3. Md.Code (1997, 2006 Repl.Vol.), § 19–509(c) of the Insurance Article, provides:

policies obligate Erie to pay the Heffernans the damages 'the law entitles [the Heffernans] to recover' from the driver and/or owner of the uninsured motor vehicle." Thus, the language contained in the automobile liability insurance policies issued to the Heffernans by Erie mirrors the language of § 19–509(c). "To the extent, if any, that the wording of the Insurance Code may indicate broader coverage than the wording of the insurance policy ... the statutory language would prevail over the insurance policy language." *Popa*, 352 Md. at 465, n. 2, 723 A.2d at 6 n. 2. Therefore, in order to determine whether Maryland or Delaware law should be applied to determine what the Heffernans would be "entitled to recover" under the uninsured motorist provisions of their policy, we must interpret § 19–509 of the Insurance Article. Accordingly, "[w]e turn first to the principles of statutory construction. Our goal when engaging in statutory interpretation is 'to ascertain and effectuate the intention of the legislature.' " *Maryland–National Capital Park & Planning v. Anderson*, 395 Md. 172, 182, 909 A.2d 694, 699, *(citing Johnson v. Mayor of Balt. City*, 387 Md. 1, 11, 874 A.2d 439, 445 (2005); *O'Connor v. Balt. County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004)). In *Johnson v. Nationwide Mut. Ins. Co.*, 388 Md. 82, 88–89, 878 A.2d 615, 618–19, we noted that

> [t]o begin with, we must consider the plain language of the statute. As noted in *Chesapeake & Potomac Tel. Co. v. Dir. of Fin. for Mayor and City Council of Baltimore*, 343 Md. 567, 683 A.2d 512 (1996), 'we begin our inquiry with the

---

(c) *Coverage required.*—In addition to any other coverage required by this subtitle, each motor vehicle liability insurance policy issued, sold, or delivered in the State after July 1, 1975, shall contain coverage for damages, subject to the policy limits, that:

(1) the insured is entitled to recover from the owner or operator of an uninsured motorist vehicle because of bodily injuries sustained in a motor vehicle accident arising out of the ownership, maintenance, or use of the uninsured motor vehicle; and

(2) a surviving relative of the insured, who is described in § 3–904 of the Courts Article, is entitled to recover from the owner or operator of an uninsured motor vehicle because the insured died as a result of a motor vehicle accident arising out of the ownership, maintenance, or use of the uninsured motor vehicle.

words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also.' *Chesapeake & Potomac Tel.*, 343 Md. at 578, 683 A.2d at 517; *see also Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204, 1206–07 ('If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.') Moreover, '[w]here the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect an intent not evidenced in that language.'' *Chesapeake & Potomac Tel.*, 343 Md. at 579, 683 A.2d at 517 *(quoting Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 755 (1993)).

## B.

### The Uninsured Motorist Statute

As we noted in *State Farm Mut. Auto. Ins. Co. v. DeHaan,* 393 Md. 163, 171–72, 900 A.2d 208, 213 (2006), the Maryland General Assembly

first enacted the uninsured motorist statute as Chapter 73 of the Acts of 1972. This section was part of a large bill which also created the Maryland Automobile Insurance Fund (MAIF), the bill provided:

'(c) In addition to any other coverage required by this subtitled, every policy or motor vehicle liability insurance, sold, or delivered in this State after January 1, 1973 may contain coverage, in at least the amounts required under Section 7–101 of Article 66½ of the Annotated Code of Maryland (1970 Replacement Volume and 1972 Supplement), for damages which the insured is entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injuries sustained in an accident arising out of the ownership, maintenance, or use of such uninsured motor vehicle.'

The statute was later amended and codified as Maryland Code (1957, 1972 Repl.Vol., 1978 Cum.Supp.), Art. 48A, § 541(c).

The enactment of this section complied with one of the recommendations made in a Report of the Special Committee on No–Fault Insurance dated January 31, 1972. The committee's recommendation stated: 'To complement the first party coverage and to protect more fully a Maryland driver, the second bill requires the driver to carry uninsured motorist coverage in the event he suffers damage caused by an out-of-state driver not protected by liability insurance.'

(Citations omitted.) The purpose of the uninsured motorist statute is to provide minimum protection for individuals injured by uninsured motorists and should be liberally construed to ensure that innocent victims of motor vehicle collisions are compensated for their injuries. *See DeHaan*, 393 Md. 163, 900 A.2d 208; *Johnson v. Nationwide Mut. Ins. Co.*, 388 Md. 82, 878 A.2d 615 (2005); *Yarmuth v. Gov't Employees Ins. Co.*, 286 Md. 256, 407 A.2d 315 (1979). The uninsured motorist statute creates a floor to liability and not a ceiling. *See Wilson v. Nationwide Mut. Ins. Co.*, 395 Md. 524, 910 A.2d 1122 (2006). Consistent with the public policy of affording minimal protection for innocent victims, an insured can purchase "a higher amount of uninsured motorist insurance which will become available when the insured's uninsured motorist coverage, as well as his damages, exceed the liability coverage of the tortfeasor." *Waters v. U.S. Fid. & Guar. Co.*, 328 Md. 700, 712, 616 A.2d 884, 889 (1992).

This Court has considered the construction of the uninsured motorist statute on numerous occasions dating back to its enactment. *See, e.g. State Farm Mut. Auto. Ins. Co. v. Md. Auto. Ins. Fund*, 277 Md. 602, 605, 356 A.2d 560, 562, (1976) (holding that an insurer's "limitation of coverage to instances of physical impact between the insured and the phantom vehicle plainly violated the legislative mandate of [the uninsured motorist statute] and is void"); *Yarmuth*, 286 Md. at 264, 407 A.2d at 319 (interpreting the uninsured motorist statute as "having the purpose of providing minimum protec-

tion to individuals injured by uninsured motorist" up to a specified amount and that a clause in an insurance policy reducing the insurance coverage to that minimum is consistent with legislated public policy); *Nationwide Mut. Ins. Co. v. Webb,* 291 Md. 721, 436 A.2d 465 (1981) (holding that "consent to sue" clauses contained within an uninsured motorist endorsement are unenforceable and contrary to the public policy expressed in the uninsured motorist statute); *Lee v. Wheeler,* 310 Md. 233, 528 A.2d 912 (1987) (holding that an insurance provision requiring physical contact between an insured vehicle and a phantom vehicle when the accident occurred out of state was contrary to the public policy expressed in the uninsured motorist statute).

*The Uninsured Motorist (UM) Statute and the Instant Case*

We next turn our attention to the applicable provisions of the UM statute to determine whether the Legislature, when it enacted the UM statute, intended for the phrase "entitled to recover" to implicate tort law. In determining the intent of the Legislature, we begin our analysis with the plain language of the statute. *State Dept. of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 12, 702 A.2d 690, 695 (1997). The crux of this appeal is our interpretation of subsection 19–509(c)(1) which provides that "the insured is *entitled to recover* from the owner or operator of an uninsured motor vehicle because of bodily injuries sustained in a motor vehicle accident arising out of the ownership, maintenance, or use of the uninsured motor vehicle." (Emphasis added.) In our view, the phrase "entitled to recover" is a tort principle. Our decision in *West American v. Popa,* 352 Md. 455, 723 A.2d 1 (1998), supports this view. Notwithstanding, Erie contends that in *Popa,* we adopted a "broad definition of 'entitled to recover'" and that from our holding in *Popa* "it logically flows that fault and damages under this Maryland contract should be established in accordance with Maryland law."

In *Popa,* the insurer, West American, issued an automobile liability insurance policy to the Popas, that stated in relevant

part "that West American 'will pay damages which a covered person is legally entitled to recover from the owner or operator of' an uninsured or underinsured motor vehicle." *Popa*, 352 Md. at 464, 723 A.2d at 5. The Popas filed suit against West American to collect uninsured motorist benefits for the death of their son, which resulted from a traffic collision with a Maryland State Police car, driven by a state trooper. West American argued, *inter alia*, that it was not required to pay any benefits to the Popas because the Popas were not "legally entitled to recover" any amounts beyond the $50,000 already paid by the State resting "upon the premise that the policy language 'legally entitled to recover' [meant] that if there is any legal bar to actual recovery from the uninsured or underinsured motorist, then the insured is not 'legally entitled to recover' his actual damages from the uninsured or underinsured tortfeasor." *Popa*, 352 Md. at 465, 723 A.2d at 5–6.

The Court rejected West American's definition of "legally entitled to recover," instead reaffirming our holding in *Reese v. State Farm Mut. Auto. Ins. Co.*, 285 Md. 548, 403 A.2d 1229 (1979), citing that definition of "legally entitled to recover[,]" i.e., proof that the uninsured motorist was at fault and the amount of damages as determinative and noting that in *Reese* we adopted a "broader definition of the policy language." [4] *Popa*, 352 Md. at 467, 723 A.2d at 7. We do not agree with Erie, however, that our holding in *Popa*, no matter the breadth of the definition of "legally entitled to recover," indicates that Maryland substantive tort law applies in this case. Our holdings in *Reese* and *Popa* certainly provide definitions of the terms "entitled to recover" and "legally entitled to recover." Neither of those cases, nor the definitions contained therein, indicate that only Maryland contract law will apply to all aspects of a contract action involving an uninsured/underinsured motorist claim no matter what issue is

4. In *Popa*, 352 Md. at 467, 723 A.2d at 7, the Popas "established fault on the part of the state employee and established their damages[,]" and, therefore, the Popas sufficiently showed that they were entitled to recover, within the meaning of the phrases "legally entitled to recover" or "entitled to recover" as set forth in *Reese*.

in dispute. *Reese* and *Popa*, however, stand for the proposition that "entitled to recover" is, itself, a tort concept. Because "entitled to recover," as it is used in the insurance policies, is a tort concept, it is subject to application of the appropriate tort law as determined by Maryland's choice of law principles.

## C.

### Choice–of–Law

Erie contends that the District Court should not refer to Maryland's tort choice of law principles to determine whether Maryland or Delaware tort law applies because the District Court can resolve this case by application of Maryland contract law. Further, Erie asserts that this case has been filed pursuant to a Maryland contract and that "fault" should be determined in accordance with Maryland law, as that is the law that the parties contemplated would apply; but, that such a determination does not indicate that Delaware tort law should be applied. Conversely, the Heffernans argue that "contract and tort law converge whenever an uninsured motorist claim is presented," and that "the forum court must apply contract principles to certain portions of the uninsured motorist claim and tort principles to other aspects." The result, the Heffernans contend, is that the forum court has to make two choice of law analyses. As discussed *infra*, we agree with the Heffernans.

Generally, in a conflict-of-laws situation, a court must determine at the outset the nature of the problem presented to it for solution, specifically, if it relates to torts, contracts, property, or some other field, or to a matter of substance or procedure. *See Handy v. Uniroyal, Inc.*, 327 F.Supp. 596 (D.Del.1971). Accordingly, we first address the nature of an action by an insured against his own insurer for uninsured motorist benefits. The action by the insured against the insurer is a contract action. Recovery is based upon the element of tortious conduct, in this case, the negligence of a third party.

In *Reese, supra,* we were presented with circumstances factually similar to those of the instant case. William Reese, the plaintiff in that action, was injured in an accident that occurred in Danville, Virginia. Reese alleged that his injuries occurred as a result of the negligence of the other driver and that State Farm Mutual Automobile Insurance Company, his insurer at the time of the collision, breached its contract by denying him coverage under the uninsured motorist provision of that policy. In *Reese,* the issue before this Court was whether "as a condition precedent to the insurer's liability . . . [an injured] plaintiff must first bring suit and recover a judgment against the uninsured motorist." *Reese,* 285 Md. at 553, 403 A.2d at 1232. Preliminarily, we determined that the language of the uninsured motorist statute in force at that time, Md.Code (1957, 1972 Repl.Vol., 1978 Cum.Supp.), Art. 48A § 541(c), and the language of the automobile insurance policy were "substantially identical," obligating State Farm " 'to pay all sums which the insured . . . shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of' bodily injury or injury to the covered vehicle." *Reese,* 285 Md. at 552, 403 A.2d at 1231. Rejecting State Farm's contention that there must first be a determination of the alleged tortfeasor's liability, we stated that uninsured motorist coverage is " 'first party coverage' like collision, comprehensive, medical payments or personal injury protection and not 'third party coverage' such as personal injury or property damage liability insurance." *Reese,* 285 Md. at 552, 403 A.2d at 1231–32. We held that "an insured need not, as a condition for recovery against his insurer under the uninsured motorist endorsement, sue and obtain a judgment against the uninsured tortfeasor." *Reese,* 285 Md. at 554, 403 A.2d at 1233. In so holding, we determined that "[a] suit based upon the insured's allegation that he is entitled to payment under one of the first party coverage clauses in the contract he entered into with his insurance carrier, and that the carrier has refused payment thereby breaching its promise, *is clearly a contract action.*" *Reese,* 285 Md. at 552–53, 403 A.2d at 1232 (emphasis added).

Furthermore, in *Reese*, we cited with approval the decision of the Supreme Court of Kansas in *Winner v. Ratzlaff*, 211 Kan. 59, 505 P.2d 606 (1973). *Winner* pointed out that the words "legally entitled to recover as damages" meant that "the insured must be able to establish fault on the part of the uninsured motorist which gives rise to the damages and to prove the extent of those damages." *Reese*, 285 Md. at 555, 403 A.2d at 1233 (citation omitted). Further, we noted that "[i]n resisting the claim the insurer would have available to it, in addition to policy defenses compatible with the statute, [the insurer could raise] the substantive defenses that would have been available to the uninsured motorist such as contributory negligence, etc.[5]" *Reese*, 285 Md. at 556, 403 A.2d at 1233; *see also, Nationwide Mut. Ins. Co. v. Webb*, 291 Md. 721, 736, 436 A.2d 465, 474 (1981) (noting, in accordance with *Reese, supra*, that the uninsured motorist statute requires the claimant to establish that he or she is "entitled to recover." This Court held in *Reese* and *Webb* that the injured party can establish that he or she is "entitled to recover" (and thereby satisfy the statutory requirement) by obtaining a "valid final tort judgment," entered against the uninsured motorist. After obtaining a final tort judgment, the injured party must then prove the contract in order to recover uninsured motorist benefits from the insurer.).

Notably absent, however, from our decisions in *Reese* and *Webb*, is any discussion of choice of law principles, specifically whether the substantive tort law of Maryland or Virginia applied to determine what William Reese was "legally entitled to recover as damages." We surmise that the issue was not squarely before the Court because there was no dispute with regard to the issue of fault. The substantive tort law of Maryland and the law of Virginia, the *situs* of the accident, at the time of the accident were the same. Specifically, Virginia, like Maryland, adhered to the common law doctrine of contrib-

---

5. *Cf. West American v. Popa*, 352 Md. 455, 723 A.2d 1 (1998) (holding that an insurer does not have every defense at its disposal in its attempt to preclude an insured from recovering uninsured/underinsured motorist benefits).

utory negligence. *See generally City of Bedford v. Zimmerman,* 262 Va. 81, 547 S.E.2d 211 (2001); *Sawyer v. Comerci,* 264 Va. 68, 563 S.E.2d 748 (2002); *Ponirakis v. Choi,* 262 Va. 119, 546 S.E.2d 707 (Va.2001); *Anderson v. Payne,* 189 Va. 712, 54 S.E.2d 82 (1949). In the case *sub judice,* unlike in *Reese,* the substantive tort law of the place of the automobile collision, Delaware, differs from the law of Maryland and, here, there are allegations that the insured was con tributorily negligent. Despite not squarely addressing the question presented before us in this case, our holding in *Reese* stands for the proposition that although an action by an insured against the insurer for uninsured/underinsured motorist benefits sounds in contract, the determination of contractual liability hinges on substantive tort law.

In *Allstate Ins. Co. v. Hart,* 327 Md. 526, 611 A.2d 100 (1992), the issue before the Court was whether the household exclusion provision in a Florida automobile insurance policy should be enforced in light of Maryland's public policy against household exclusion clauses contained in such policies. We noted that "[i]n deciding questions of interpretation and validity of contract provisions, Maryland courts ordinarily should apply the law of the jurisdiction where the contract was made. This is referred to as the principle of *lex loci contractus."* *Hart,* 327 Md. at 529, 611 A.2d at 101 (citations omitted). Both the Heffernans and Erie concede that the automobile insurance policy issued to the Heffernans by Erie was issued, delivered and executed in Maryland and is, therefore, a Maryland contract. To that end, for choice of law purposes, we generally would apply Maryland law to decide questions of the interpretation and validity of the policies issued by Erie to the Heffernans.

A contract action for uninsured/underinsured motorist benefits may raise issues of both tort and contract law, even though the action sounds in contract. *See Reese,* 285 Md. at 552–53, 403 A.2d at 1231; *Lee v. Saliga,* 179 W.Va. 762, 373 S.E.2d 345, 349 (1988) (holding that the physical contact requirement is a contract question as opposed to a liability

question for conflicts of law purposes); *see also* Eugene F. Scoles et al, Conflict of Laws, § 17.56 (4th ed.2004) (discussing the split of authority as to whether the insured must prove he or she is legally entitled to recover under the law of the state where the policy was issued or the state in which the accident occurred, for purposes of uninsured/underinsured motorist coverage); *Crossley v. Pacific Employees Ins. Co.*, 198 Neb. 26, 251 N.W.2d 383, 386 (1977) (holding that in an action to recover uninsured motorist benefits, the law of the state where the accident occurred controls the right to recover and the amount of the recovery (in that case, Colorado's no-fault law governed the threshold issue of the tortfeasor's liability)).

As discussed *supra,* uninsured motorist coverage is first party coverage that exists where a third party is at fault and the third party was not adequately insured. A breach of contract action filed against the insurer on the basis of an uninsured/underinsured motorist claim "differs from that which [the insured] would normally prosecute against the tortfeasor in that he must prove the contract and then his tort claim, which is an element of his contractual right to recover damages." *State Farm Mut. Auto. Ins. Co. v. Fass*, 243 So.2d 223, 224 (Fla.App.1971); *see also Reese*, 285 Md. at 554, 403 A.2d at 1232. By contrast, in a direct action against the tortfeasor, the injured party "must prove four well-established elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." " *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship*, 375 Md. 522, 535, 826 A.2d 443, 451 (2003) (citations omitted).

Here, we are not asked to interpret the validity of a contractual term or decide questions of coverage. The question here is the applicability of the appropriate substantive law to resolve the issues of tort liability and damages. Because the nature of the problem relates to tort, rather than contract principles, we look to tort choice of law principles, namely, the

law of the place of the accident to answer the question. In that regard, Delaware is the place of the tort and the place of injury.

### Lex Loci Delicti

█ Maryland law is clear that in a conflict of law situation, such as the one presented in the case *sub judice*, "where the events giving rise to a tort action occur in more than one State, we apply the law of the State where the injury-the last event required to constitute the tort occurred." *Laboratory Corp. of America v. Hood*, 395 Md. 608, 614, 911 A.2d 841, 845 (2006). This principle is *lex loci delicti*. Consistent with the principle of *lex loci delicti*, because the automobile collision occurred in Delaware, under Maryland law, a Maryland Court would apply the substantive tort law of Delaware to determine what the claimants are "entitled to recover" in an action for uninsured motorist benefits. We conclude, pursuant to Maryland law, that an action by an insured against his insurance company for uninsured motorist benefits is a contract action. Although principles of *lex loci contractus* apply to contract disputes, because the uninsured motorist statute and the insurance policies, by the incorporation of the phrase "entitled to recover," references tort law, the substantive tort law of where the accident occurred applies, generally, to the issues of fault and damages.

### Depecage [6]

█ Our decision in this case embraces the concept of "depecage." Discussing depecage, the Supreme Court of Virginia noted that " '[i]t has always been understood ... that different substantive issues could be properly decided under the laws of different states, when the choice-influencing considerations differ as they apply to the different issues.' " *Buchanan v. Doe*, 246 Va. 67, 431 S.E.2d 289 (1993) (internal

---

6. Depecage is defined as "[a] court's application of different state laws to different issues in a legal dispute; choice of law on an issue-by-issue basis." BLACK'S LAW DICTIONARY 469 (8th ed.1999).

citations omitted). *See generally, Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455 (3rd Cir.2006); Reese, *Depecage: A Common Phenomenon in Choice of Law*, 73 Column. L.Rev. 58 (1973). Erie warns against this Court's adoption of depecage. According to Erie, the depecage framework is inappropriate in this case because it would act to "legitimize a smorgasbord approach which inures only to the benefit" of the Heffernans.[7] To the contrary, our holding today presents a clear framework for resolving choice of law issues such as the one presented in the instant case. This determination will allow insurers and insureds to predict with reasonable certainty the law that will apply in a breach of contract action against the insurer on the basis of an uninsured/underinsured motorist claim. Specifically, all parties to a contract which provides uninsured/underinsured motorist benefits can anticipate that, absent a contractual choice of law provision, any dispute as to the validity of the policy or the meaning of its terms will be resolved based on the law of where the contract was made, but that the substantive tort law of the place where the automobile collision occurred will control what the claimants are "entitled to recover."

This is not the first time that this Court has embraced the principles of depecage. In *Hauch v. Connor*, 295 Md. 120, 453 A.2d 1207 (1983), we adopted a similar framework, applying the tort law of a foreign jurisdiction to certain issues while applying Maryland law to other issues. In *Hauch* the issue before the Court was whether Maryland residents, who were injured in an automobile collision in Delaware could maintain a personal injury action in Maryland against their co-employee, who was the driver when such an action was not allowed by Delaware law. In that case, we held that "all questions concerning substantive tort law [should] be governed by the

---

**7.** The theory advanced by Erie, however, is plainly inconsistent with our previous holdings. As discussed, *supra*, the definition of "entitled to recover" urged by Erie leads to bizarre results. Under Erie's theory, clearly inconsistent with Maryland law, if the Heffernans elected to bring a tort suit against the tortfeasor in Delaware, Maryland tort law would govern the action. Our decision today avoids such anomalies.

law of Delaware, as it is the state where the collision occurred." *Hauch*, 295 Md. at 125, 453 A.2d at 1210. Although the law of Delaware applied to all questions concerning substantive tort law, we also applied Maryland's worker's compensation law because, even though the injury did not occur in Maryland, there were greater Maryland interests. Specifically, we acknowledged that the worker's compensation statute is analogous to a statute of limitations in that both matters implicate the public policy of the forum rather than the public policy of another jurisdiction. We concluded, therefore, as we do in the case *sub judice*, that Delaware law should apply to certain aspects and Maryland law to other aspects, depending upon the issues raised in the proceedings. *See also Bishop v. Twiford*, 317 Md. 170, 175, 562 A.2d 1238, 1241 (1989) (relying on *Hauch*, holding that Delaware law controlled questions of substantive tort law but that "the choice of law principles, relevant to whether a co-employee suit was allowable, were not those of tort law but those of worker's compensation law" and, thus, Maryland's worker's compensation statute applied to an employee's action against a negligent co-employee (citations omitted)).

Other jurisdictions that have decided whether an action for uninsured motorist benefits by an insured against his or her insurer raises questions of tort law, and therefore application of tort choice of law principles, or in the alternative, raises only questions of contract law, are consistent with this approach. In *Lee v. Saliga*, 179 W.Va. 762, 373 S.E.2d 345 (1988), one of the certified questions presented to the court, involved a question of coverage under uninsured motorist policies. As to the nature and scope of uninsured motorist insurance, the court noted that "[t]here is in any uninsured motorist case a related tort aspect" and that "[t]he determination of the uninsured motorist's liability is to be made by reference to the general rules of tort law ... [but] the insured 'must allege and prove the same elements of fault and damages that are required to be proved in common law tort actions against tortfeasors.'" *Saliga*, 373 S.E.2d at 348 (internal citations omitted). Erie argues that the court in *Saliga*

engaged in a two part choice of law analysis "because, under the particular uninsured motorist law, the insured is required to establish the actual liability of the tortfeasor."

 Further, Erie argues that, pursuant to *Popa*, this is not the case in Maryland, because the insured is required to prove "fault" on the part of the uninsured motorist and damages, and not prove the uninsured motorist's actual liability. We agree insofar as *Popa* stands for the principle that in Maryland the insured need not first prove all the elements of a tort cause of action and obtain a judgment against the tortfeasor in order to pursue a claim against the insurer for uninsured/underinsured motorist benefits. In the breach of contract action, however, the insured, nonetheless, must prove his or her tort claim in order to establish that the contract was breached. Proof of the underlying tort claim is an element of the insured's contractual right to recover. *See Popa*, 352 Md. at 464, 723 A.2d at 5; *Reese*, 285 Md. at 553, 403 A.2d at 1232; *Fass*, 243 So.2d at 224.

We acknowledge that the application of tort choice of law principles in *Saliga* resulted in the court's application of the tort law of the forum state even though the tort occurred in another state. We agree, however, with the Heffernans that the court in *Saliga* applied the tort law of the forum state only after engaging in a tort choice of law analysis. The application of the forum state's tort law rather than the application of the law of the *situs* of the collision, contrary to Erie's urging, is not consequential. In our view, *Saliga* is instructive insofar as it provides the proper framework for analysis of a breach of contract action against the insurer on the basis of an uninsured/underinsured motorist claim, not because of that court's disposition. Further, we are persuaded by *Saliga* that a breach of contract action against the insurer on the basis of an uninsured/underinsured motorist claim may involve issues of coverage as to the contract and issues of liability as to the underlying tort. *See Johnson v. United States Fidelity and Guaranty Co.*, 269 Neb. 731, 696 N.W.2d 431, 437 (2005) (noting that "[a]ctions for uninsured (UM) and underinsured

(UIM) coverage can involve both tort and contract liability"); *Buchanan v. Doe,* 246 Va. 67, 431 S.E.2d 289, 291 (1993) (" 'forum state applies its own law to ascertain whether the issue is one of tort or contract' ").

Erie urges this Court to abandon the *lex loci delicti* approach, arguing that the most significant relationship test is the most appropriate choice of law analysis for uninsured motorist claims. We disagree. "The rule of *lex loci delicti* is well established in Maryland. When its rationale has been put into question, 'this Court has consistently followed the rule.' " *Hauch,* 295 Md. at 123–24, 453 A.2d at 1209 (*quoting White v. King,* 244 Md. 348, 352, 223 A.2d 763 (1966)). Since *White,* we have continued to adhere to the rule of *lex loci delicti. Hood,* 395 Md. at 615, 911 A.2d at 845, is a recent reaffirmation of that rule. In *Hood,* Judge Wilner, writing for the Court, noted that "unlike most other States, which have abandoned the *lex loci delicti* approach espoused in §§ 6, 145 and 146 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, Maryland continues to adhere generally to the *lex loci delicti* principle in tort cases." *Id.* (citations omitted). Erie states that adopting the most significant relationship test "would allow for proper consideration of the importance of applying the law of the state where the risk is located." Erie cites our decision in *Hauch* as supporting its position. We agree that *Hauch* is instructive on this point. That case, however, dictates a result different than that urged by Erie. In *Hauch* we said that

> [a] virtue of the rule, for the courts and all parties concerned, is the predictability and certainty as to which state's tort law will govern. Furthermore, *lex loci delicti* recognizes the legitimate interests which the foreign state has in the incidents of the act giving rise to the injury. The foreign state's resources in the form of police protection, medical assistance and highway maintenance, to mention a few, are expended whenever an automobile collision occurs within its boarders. Also, when wrongful conduct occurs in a foreign state, it poses a direct threat to persons and property in that state. It follows that the citizens of the

foreign state should be the ones to determine, through their tort law, whether particular conduct is tortious and the extent of the monetary sanction.

*Hauch,* 295 Md. at 125, 453 A.2d at 1210 (citations omitted). We see no reason to discontinue our adherence to the principles of *lex loci delicti.* Our application of the principles of *lex loci delicti* in this case leads to a consistent, predictable approach. Consistent with these principles, the insured must establish the tortfeasor's fault and damages pursuant to the substantive tort law of the *situs* of the accident.[8]

## Renvoi

Erie also argues that under the circumstances presented by this case, this Court should apply the doctrine of *renvoi.* In *American Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 570, 659 A.2d 1295, 1301–1302 (1995), we said

[r]envoi is a French word meaning 'send back' or 'remit.' It has been suggested that the doctrine of *renvoi* was formu-

---

**8.** In *Dwayne Clay v. Government Employees Ins. Co.,* 356 Md. 257, 265, 739 A.2d 5, 9–10 (1999), we said that

Maryland's mandated uninsured motorist coverage embodies a public policy "to assure financial compensation to the innocent victims of motor vehicle accidents who are unable to recover from financially irresponsible uninsured motorists." *Lee v. Wheeler,* 310 Md. 233, 238, 528 A.2d 912, 915 (1987) (quoting *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Gartelman,* 288 Md. 151, 157, 416 A.2d 734, 737 (1980)). *See also Nationwide Mut. Ins. Co. v. Webb,* 291 Md. 721, 737, 436 A.2d 465, 474 (1981) ('The courts have repeatedly stated that the purpose of uninsured motorist statutes is 'that each insured under such coverage have available the full statutory minimum to exactly the same extent as would have been available had the tortfeasor complied with the minimum requirements of the financial responsibility [l]aw.' ' (*quoting Webb v. State Farm Mut. Auto. Ins. Co.,* 479 S.W.2d 148, 152 (Mo.Ct.App.1972))). The uninsured motorist statutory plan is remedial in nature and 'dictates a liberal construction in order to effectuate its purpose of assuring recovery for innocent victims of motor vehicle accidents.' *State Farm Mut. Auto. Ins. Co. v. Maryland Auto. Ins. Fund,* 277 Md. 602, 605, 356 A.2d 560, 562 (1976).

Our interpretation of "entitled to recover" effectuates the Legislature's intention to assure recovery for innocent victims of motor vehicle accidents.

lated to avoid the harshness of the traditional common law choice-of-law principles. The doctrine of *renvoi* is basically that, when the forum court's choice-of-law-rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules. If, in applying *renvoi* principles, the foreign jurisdiction's conflict of law rules would apply the forum's law, this reference back of the forum to its own laws is called a remission ... If the choice-of-law rules of the foreign jurisdiction whose laws the forum would apply refers the forum court to the law of a third jurisdiction that is called a transmission.

(Citations omitted.) Erie argues that the Court should apply the principle of *renvoi* and that a Maryland court should look to the entire body of Delaware law, including Delaware conflict of law principles and determine whether Delaware would apply Maryland law to decide the coverage issue presented. Erie argues that, in the instant case, Delaware would apply the law of Maryland to the underlying dispute since Delaware conflict of law rules apply the "most significant contacts test" of Restatement (Second) Conflict of Laws. To the contrary, the Heffernans argue that *renvoi* is a limited exception and that the instant case is an inappropriate situation in which to apply the doctrine. Further, the Heffernans contend that if Maryland were to adopt *renvoi* in the instant case, the factors, as outlined in *ARTRA*,[9] necessary for a Maryland court to override *lex loci delicti* and apply its own law, are not present.

In *ARTRA*, which Erie contends supports its position, we applied only a *limited* form of *renvoi* that allowed the Court "to apply Maryland law where the application of *lex loci*

_____

9. The Heffernans argue that "two factors must be present: (1) Maryland must have either 'the most significant relationship, or, at least, a substantial relationship' to the tort at issue, and (2) Delaware 'would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court.' " *See ARTRA*, 338 Md. at 579, 659 A.2d at 1301. We choose not to apply the doctrine of *renvoi* in the instant case.

*contractus* indicate[d] that the foreign jurisdiction would apply Maryland law to the substantive issues of the controversy." *ARTRA*, 338 Md. at 573, 659 A.2d at 1301. *ARTRA* is distinguishable from the case *sub judice*. In that case, the issue was whether a commercial general liability insurer had a duty to defend or indemnify the insured seller of a paint factory under circumstances where the allegations of the underlying suit did not give rise to a potentiality of coverage. In interpreting the issue of coverage, which involved the clean up of polluted land in Maryland, we concluded that it was appropriate to apply Maryland law even though the insurance contracts at issue were entered into in Illinois. To reach that result, this Court "assume[d] that Illinois choice-of-law rules would dictate the application of Maryland law to the substantive issues in [that] case." *ARTRA*, 338 Md. at 568, 659 A.2d at 1298.

The contract at issue in the present case involves enforcement of an underinsured motorist provision of an automobile liability insurance policy, which, unlike the contract in *AR-TRA*, was entered into in Maryland. Ordinarily, where the contract between the parties was entered into in Maryland, under the doctrine of *lex loci contractus*, we would, as a first step in our analysis, look to the law of Maryland to interpret the terms of the contract. The reason that we look to the law of the foreign jurisdiction, in this case, is because of our consistent adherence to the principle of *lex loci delicti*, which requires that we look at the substantive law of the place of the injury to resolve the tort aspects of the case. *ARTRA* is also distinguishable from the instant case because in *ARTRA* the Court was concerned that the strict application of the doctrine of *lex loci contractus* would encourage forum shopping and would lead to an anomalous result.

A search of this Court's previous decisions fails to yield any case in which this Court has applied *renvoi* in a case involving the application of *lex loci delicti*. Further, in this case we are not of the opinion that the application of *lex loci delicti* will result in any harshness that the application of the doctrine of *renvoi* would avoid. Instead the insured will be entitled to

recover the amount for which he has contracted, provided he establishes fault and the amount of his damages. Accordingly, the application of *lex loci delicti* produces both fair and clear results. In our view, an application of the substantive tort law of the state in which the injury occurred, produces a result that is predictable and cannot be fairly described as anomalous.

## D.

### Maryland's Public Policy Exception

■ As discussed *supra,* under *lex loci delicti,* Delaware law should govern what the Heffernans are "entitled to recover." In answer to the second certified question, Maryland's public policy exception to the doctrine of *lex loci delicti* does not require the application of Maryland's statutory cap on non-economic damages, Md.Code. Ann., Cts. & Jud. Proc. § 11–108. As discussed *infra,* Maryland's statutory cap is inapplicable for a number of reasons. First, it does not apply because it is part of the substantive law of Maryland, not our procedural law. Next, the insurer is not entitled to assert as a defense every statutory limitation on the recovery of damages. Lastly, this is not a situation in which the Maryland Legislature has stated that the statutory cap should be applied in a breach of contract action against the insurer on the basis of an uninsured/underinsured motorist claim.

■ There exists a well established exception to the traditional rule of *lex loci delicti.*[10] Under the exception, the law of the forum will be applied whenever the law of the place of the wrong is contrary to a strong public policy of the forum state. *See Schmidt v. Driscoll Hotel, Inc.,* 249 Minn. 376, 82 N.W.2d 365 (1957). Erie argues that even if we apply *lex loci delicti,* Maryland's public policy exception to that doctrine,

---

**10.** *Lex loci delicti,* as a rule, embraces the concepts of contributory negligence and comparative negligence, showing no preference to either doctrine. *Lex loci delicti* seeks only to apply the law of the place of the accident.

nonetheless, requires application of Maryland's statutory cap and Maryland's contributory negligence principles. We disagree because pursuant to *lex loci delicti*, we apply the substantive law of the place of the injury.

The Heffernans contend that Maryland's "public policy must be very strong and not merely a situation in which Maryland law is different from the law of another jurisdiction." In *Bethlehem Steel Corp. v. G.C. Zarnas & Co., Inc.*, 304 Md. 183, 498 A.2d 605 (1985), before the Court was a conflict of law question; specifically, whether a provision of a construction contract executed in Pennsylvania was contrary to Maryland public policy and therefore unenforceable. In that case we said, "that merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy and thus unenforceable in our courts. Rather, for another state's law to be unenforceable, there must be 'a strong public policy against enforcement in Maryland,' or 'a public policy sufficient to require the application of law other than the law of the place of the contract,'" *Bethlehem Steel Corp.*, 304 Md. at 189, 498 A.2d at 608 (citations omitted). In that case, the Court determined that, in § 5-305 of the Courts and Judicial Proceedings Article, the General Assembly explicitly determined the public policy regarding the type of indemnity clause at issue and accordingly held that Maryland public policy is sufficiently strong to preclude an application of Pennsylvania law under the circumstances of that case. In *Texaco, Inc. v. Vanden Bosche*, 242 Md. 334, 340, 219 A.2d 80, 83 (1966), this Court noted "that a public policy which will permit a state to refuse to enforce rights created by the law of a sister state must be very strong indeed" (citations omitted) (finding persuasive indications that Virginia law imposing personal liability on directors, officers and agents of foreign corporations would be valid in a lawsuit in Maryland). In *Harford Mut. Ins. Co. v. Bruchey*, 248 Md. 669, 674, 238 A.2d 115, 117 (1968), this Court considered whether Maryland had "such a strong public policy in favor of recovery by a husband for loss of consortium as to require its courts to refuse to apply the law of a sister State which does

not recognize such a right." The Court, relying on *Vanden Bosche*, saw "merely a difference of law between the place of the wrong and the forum and not an overriding public policy of the forum," and therefore held that the public policy was insufficient to invalidate the application of *lex loci delicti*. *Bruchey*, 248 Md. at 676, 238 A.2d at 119.

We have applied the same public policy exception analysis under the *lex loci contractus* rule. In *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 535 A.2d 466 (1988), the question was whether a New Jersey gambling contract violated Maryland public policy such that a Maryland court should refuse to apply New Jersey law. Richard Kramer wrote a check in the amount of $5000, payable to Bally's Park Place, as "consideration under a gambling contract or payment of a gambling debt." *Kramer*, 311 Md. at 389, 535 A.2d at 467. Kramer argued, *inter alia*, that gambling debts are not recognized as legal or valid in Maryland. Citing *Zarnas, supra*, we noted that "for Maryland public policy to override the *lex loci contractus* rule, the public policy must be very strong and not merely a situation in which Maryland law is different from the law of another jurisdiction." *Kramer*, 311 Md. at 390, 535 A.2d at 467 (citations omitted). In *Kramer*, we reviewed previous decisions regarding gambling debts as well as statutory provisions relating to the enforcement of gambling debts or contracts. The Court noted that the statute regarding gambling debts at issue in that case, Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 243, "differ[ed] significantly from the statute at issue in [*Zarnas*] ... [and that statute] unequivocally told the Maryland judiciary that certain indemnification provisions were 'void and unenforceable' and expressly stated that such provisions [were] 'against public policy.'" *Kramer*, 311 Md. at 395, 535 A.2d at 470 (citations omitted). Further, the Court determined that the controlling statute did not clearly prohibit the gambling contract at issue, as the statute did in *Zarnas*, and that our holding in *Bender v. Arundel Arena*, 248 Md. 181, 236 A.2d 7, 11 (1967), established as a public policy that the "enforceability of gambling debts and contracts largely depends on whether the type of gambling

engaged in is legal or illegal." In light of our holding in *Bender* and because Maryland allowed some forms of gambling, we concluded that Maryland's public policy against gambling debts was not sufficiently strong to override the *lex loci contractus* principle.

Erie contends that to achieve the goal of the non-economic damages cap, purportedly to reduce premiums and increase the amount of affordable insurance, it is imperative that this Court apply the cap in breach of contract actions against the insurer on the basis of uninsured/underinsured motorist claims. Further, Erie argues that "the fact that the Maryland Legislature has created [a] statutory cap on non-economic damages[,] demonstrates Maryland's strong public policy to limit such damages as a means to ensure affordable insurance coverage." The Heffernans argue that the only reasonable construction of Maryland's non-economic damages statute is that the cap "does not apply to contract claims for uninsured motorist benefits and that, even if Maryland tort law generally applies to the issue of 'entitled to recover,' the cap cannot be used to diminish the recovery of the limits of insurance purchased by the insureds." Even assuming that the Heffernans' position on this point is correct, we need not and do not decide that issue in this case.

In *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), the issue was whether Maryland's statutory cap on non-economic damages violated the Maryland Constitution. In holding that the statutory limit on non-economic damages in personal injury actions does not violate Maryland's constitutional guarantee of equal protection, the Court reviewed the Legislature's decision to enact the cap. In that case, we said that "[s]ection 11–108 was enacted in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State. This crisis resulted in the unavailability of liability insurance for some individuals and entities...." *Murphy*, 325 Md. at 368, 601 A.2d at 114. To that end, we opined that "[t]he General Assembly's objective in enacting the cap was to assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover

claims for personal injuries to members of the public." *Murphy,* 325 Md. at 369, 601 A.2d at 115. Furthermore, in *United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993), where the issue before the Court was the applicability of the non-economic damages cap in wrongful death actions, the Court reaffirmed the historical findings set forth in *Murphy* (declining to restrict the type of damages recoverable in a wrongful death action by application of the statutory cap and holding that the cap is inapplicable to a wrongful death action; and, further concluding that the Legislature did not intend "personal injury," as used in the cap statute, to include damages recoverable in a wrongful death action).[11]

The Court of Special Appeals' decision in *Black v. Leatherwood Motor Coach Corp.,* 92 Md.App. 27, 606 A.2d 295 (1992), is particularly illustrative for present purposes. In *Black,* Virginia and District of Columbia residents brought an action against the Leatherwood company after they were injured while riding on a bus owned by that company. *Black,* 92 Md.App. at 31, 606 A.2d at 296–7. Following the trial, Leatherwood sought to have the jury's award to one of the injured parties and her husband reduced pursuant to Md.Code. Ann., Cts. & Jud. Proc. § 11–108. Leatherwood, on appeal, claimed "that the trial judge erred when he failed to apply the 'cap' on non-economic damages and reduce the jury's award. ..." Leatherwood further argued that Maryland's non-economic damages cap is part of the procedural law of Maryland and, therefore, under *lex loci delicti,* the procedural law of the forum, in that instance, Maryland, should govern. At trial, all parties agreed that "pursuant to the conflict of laws principle of *lex loci delicti,* the substantive tort law governing th[at] case was th[e law] of New Jersey." *Black,* 92 Md.App. at 37, 606 A.2d at 300.

We agree with the Court of Special Appeals' assessment, in *Black,* that the substantive law was to be determined by the

---

**11.** In 1994 the General Assembly enacted amendments to § 11–108 which made the limitation on non-economic damages applicable to wrongful death claims. *See* 1994 Md. Laws, ch. 477.

place of wrong, and the procedural law was to be determined by the law of the forum. *Id. (citing Jacobs v. Adams,* 66 Md.App. 779, 790, 505 A.2d 930 (1986) (holding that under the rule of *lex loci delicti* the substantive tort law is determined by the place of the wrong, in that case New Jersey, and the procedural law is governed by the law of the forum, in that case Maryland)). We further agree with the intermediate appellate court's holding "that the statutory cap on non-economic damages is part of the substantive law of Maryland" and that under the circumstances of that case there was no overriding public policy reason to apply the law of the forum. Further, the intermediate appellate court said that it "found no modern Maryland cases which have, in fact, invalidated the *lex loci delicti* rule on public policy grounds. . . ." *Black,* 92 Md.App. at 43, 606 A.2d at 303. Specifically, we emphasize that the statutory cap is part of the substantive law of Maryland and it is, therefore, inapplicable to this case, which is governed by the substantive law of Delaware.

Section 412 of the First Restatement of Conflicts of Laws supports our holding. Section 412 provides that "[t]he measure of damages for a tort is determined by the place of the wrong." This Court approved the First Restatement of Conflict of Laws in *Steger v. Egyud,* 219 Md. 331, 337, 149 A.2d 762 (1959) (holding that "New Jersey law applies and controls all matters of substance, including the extent of liability and the right to, and measure of contribution").

We adhere to the principle of *lex loci delicti.* The substantive law of Delaware applies to the tort aspects of this direct action against the insurer for breach of contract. As discussed *supra,* Maryland's non-economic damages cap is substantive in nature and not part of the procedural law of Maryland. We agree with the rationale of the intermediate appellate court in *Black* that "failure to apply the cap will [not] result in an increase in insurance premiums or decrease the availability of insurance for Maryland residents." *Black,* 92 Md.App. at 48, 606 A.2d at 305. Similar to the reasoning in *Black,* we conclude that the policies behind the cap on non-economic damages will not be offended by our reasoning in

this case. The contract for uninsured/underinsured motorist coverage was based on the insurer's duty to pay benefits in situations where there was no or insufficient liability coverage. Uninsured/underinsured motorist benefits are designed to place the injured insured in the same position he would have been in had the tortfeasor maintained liability insurance or adequate liability insurance. *Forbes v. Harleysville*, 322 Md. 689, 709–10, 589 A.2d 944, 954 (1991). We find the rationale of *Black* persuasive, and hold that Erie has not met its "heavy burden" of establishing that Maryland public policy is sufficiently strong to warrant overriding the rule of *lex loci delicti* to require the application of Maryland substantive law to the tort aspects of this case.

Although the statute at issue in *Zarnas* expressed a clear public policy sufficient to override the principle of *lex loci contractus*, as to Maryland's statutory cap on non-economic damages, Md.Code. Ann., Cts. & Jud. Proc. § 11–108, we do not see such a strong public policy expressed therein such that we should, by analogy, override the principle of *lex loci delicti*. *Cf. Hood*, 395 Md. at 625, 911 A.2d. at 851 (holding that denying Maryland residents the right to bring a wrongful birth action by applying North Carolina law would "be contrary to a clear, strong and important Maryland public policy" as reflected in statutory and case law). This Court is not persuaded that allowing the Heffernans, or others similarly situated, *potentially* to recover the full amount of the benefits, for which they contracted, will impact significantly the availability or affordability of liability insurance in the State of Maryland. This is merely a situation in which the law of Maryland and Delaware are different. The Maryland General Assembly has not addressed specifically the issue of the applicability of the non-economic damages cap to claims for uninsured/underinsured motorist damages and has not given an unequivocal directive to the Maryland Judiciary to apply the cap in these cases. *See Bethlehem Steel*, 304 Md. at 190, 498 A.2d 605. The principle of *lex loci delicti*, therefore, is enforceable in a breach of contract action against the insurer

on the basis of an uninsured/underinsured motorist claim despite Maryland's cap on non-economic damages.

 Lastly, Erie contends that "Maryland has a strong policy of adhering to the common law doctrines of contributory negligence and assumption of the risk." Erie relies, *inter alia,* on our decision *Harrison v. Montgomery County Bd. of Ed.,* 295 Md. 442, 456 A.2d 894 (1983). Similarly, Erie argues that the decision of the Supreme Court of West Virginia in *Mills v. Quality Supplier Trucking, Inc.,* 203 W.Va. 621, 510 S.E.2d 280 (1998) is persuasive, insofar as that case provides the proper framework for our decision in this case. The Heffernans, on the other hand, contend that the Court of Special Appeals' decision in *Linton v. Linton,* 46 Md.App. 660, 420 A.2d 1249 (1980), is more persuasive. The Heffernans urge this Court to adopt the same conclusion that the intermediate appellate court adopted in *Linton;* specifically, that "Delaware's law is different than Maryland's, but Maryland's public policy is not offended by the application of Delaware's law."

It is consistent with Maryland's public policy to apply the relevant substantive law of Delaware to the questions of liability and damages in this case. As we stated in *Hauch,* 295 Md. at 125, 453 A.2d at 1210, "all questions concerning substantive tort law [should] be governed by the law of Delaware, as it is the state where the collision occurred." The principle of contributory negligence is a matter which relates to Maryland substantive law. The principle of comparative negligence, however, is a matter which relates to Delaware substantive law. *See* 10 Del. C. § 8132; *Laws v. Webb,* 658 A.2d 1000,1005 (Del.1995)(noting that "[t]he enactment of the comparative negligence statute manifest[ed] a legislative intent to change Delaware's common law rule of contributory negligence"). Thus, Erie's suggestion that this Court would apply Maryland substantive law to resolve the issues of liability and damages in this case is incorrect. There is a strong public policy in Maryland to apply the law of the place of the injury in tort conflict of law cases. With that policy in mind, we see

no good reason to reject the application of Delaware substantive law to resolve the question of entitlement to recover damages.

**CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE; COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.**